# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LINDA BEDELL, THE LINDA BEDELL INDIVIDUAL RETIREMENT ACCOUNT, LANDON BEDELL, KEATON BEDELL, and INNER DESIGN, INC. PROFIT SHARING PLAN, | **Civil Action No.:** |
| | **Complaint** |
| Plaintiffs, | **Jury Trial Demanded** |
| v. | |
| GEORGE HECKLER, MARK S. CARROW, CASSATT SHORT TERM TRADING FUND, LP, CV SPECIAL OPPORTUNITY FUND, LP, CITRIN COOPERMAN & COMPANY, LLP, TOPWATER INVESTMENT MANAGEMENT LLC, and GREEN MOUNTAIN FUND, LLC, | |
| Defendants. | |

## COMPLAINT

For years, Defendants embarked on a scheme to strip Plaintiff Linda Bedell and her family of more than $35 million—virtually their entire net worth—through a series of bogus investments in hedge funds. Indeed, through a highly choreographed effort, Defendants pretended to act in Ms. Bedell's best interest by recommending and supporting her ever-increasing investments in a group of private funds controlled by Defendant George Heckler. As detailed below, however, the funds were nothing more than a series of elaborate Ponzi schemes.

Based upon lie after lie touting the safety and growth of Ms. Bedell's investments, the scheme continued until August 2019, when Brenda Smith, the funds' purported administrator, was arrested and charged with wire and securities fraud for running *another* Ponzi scheme involving a different hedge fund, which collapsed leaving victim-investors penniless.  Despite repeated efforts to liquidate their accounts, and repeated promises by Mr. Heckler that their money was safe and secure, it is now apparent that Plaintiffs' entire investment was stolen and/or dissipated.

Defendants are liable both directly and indirectly for the theft and misappropriation of Plaintiffs' assets.  Specifically, Plaintiffs assert claims for: violations of 70 P.S. §§ 1-401 and 1-501 of the Pennsylvania Securities Act against Mr. Heckler (Count I); fraud against Mr. Heckler, Mark Carrow, Cassatt Short Term Trading Fund, LP, and CV Special Opportunity Fund, LP (Count II); aiding and abetting fraud against Citrin Cooperman & Company LLP (Count III); breach of fiduciary duty against Citrin Cooperman (Count IV); aiding and abetting breach of fiduciary duty against Citrin Cooperman (Count V); breach of contract against Mr. Heckler (Count VI); and aiding and abetting fraud against Topwater Investment Management, LLC and Green Mountain Exclusive Fund, LLC (Count VII).

## PARTIES

1.      Plaintiff Linda Bedell ("Ms. Bedell") is an individual who resides at 594 W. Buttermilk Road in Aspen, Colorado.

2.      Plaintiff Linda Bedell Individual Retirement Account is a retirement plan based in Aspen, Colorado.

3.      Plaintiff Landon Bedell is an individual who resides at 594 W. Buttermilk Road in Aspen, Colorado.

4.      Plaintiff Keaton Bedell is an individual who resides at 594 W. Buttermilk Road in Aspen, Colorado.

5.      Plaintiff Inner Design, Inc. Profit Sharing Plan is a retirement plan based in Aspen, Colorado.

6.      Defendant George Heckler ("Mr. Heckler") is an individual who resides at 5 Alexander Street, Charleston, South Carolina.

7.      Defendant Mark Carrow ("Mr. Carrow") is an individual who resides at 492 S Bryn Mawr Ave, Bryn Mawr, Pennsylvania.  Mr. Carrow served as the managing member of Conestoga Partners Holdings, LP ("Conestoga") and Cassatt.  Mr. Carrow is also the managing partner at Defendant Citrin Cooperman & Company, LLP.

8.      Defendant Citrin Cooperman & Company, LLP ("Citrin Cooperman") is a New York limited liability partnership with a principal place of business located at 529 Fifth Avenue, 2nd Floor, New York, NY 10017.  Beginning in or around 2010, Citrin Cooperman provided accounting and business consulting services to the funds and served as Ms. Bedell's personal accountant and tax advisors.

9.      Defendant Cassatt Short Term Trading Fund, LP ("Cassatt") is a Delaware limited partnership with a principal place of business at 300 Conshohocken State Road, Suite 200, West Conshohocken, Pennsylvania.  At all relevant times, Cassatt Fund Partners, LLC ("Cassatt LLC") was the general partner of Cassatt.

10.      Defendant CV Special Opportunity Fund, LP ("CV Opportunities") is a Delaware limited partnership with its principal place of business located at 300 Conshohocken State Road, Suite 200, West Conshohocken, Pennsylvania.  At all relevant times, CV Fund Partners, LLC ("CV LLC") was the general partner of CV Opportunities.

11.     Defendant Topwater Investment Management, LLC ("Topwater") is an asset management company with a principal place of business located at 55 N Water Street, Suite 3, Norwalk, CT 06854.  At all relevant times, Topwater was managed by Timothy O'Shea, Bryan Borgia, and Travis Taylor.

12.     Defendant Green Mountain Exclusive Fund, LLC ("Green Mountain") is a Delaware limited liability company with its principal of business located at 55 North Water Street, Suite 3, Norwalk, CT, 06854.  At all relevant times, Mr. Borgia severed as the managing member of Green Mountain.

## JURISDICTION

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a) (1) and (2), because the parties to this action are sufficiently diverse and the amount in controversy exceeds $75,000.  Plaintiffs are residents of Colorado, while Defendants are residents of South Carolina, Pennsylvania, New York, Delaware, and Connecticut.  Plaintiffs seek relief amounting to over $35 million.

14.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 (b) and (c) in that many of the acts and transgressions alleged herein occurred in substantial part in this District.

**The Genesis and Creation of Conestoga**

15.     In or around 1998, Mr. Carrow formed Conestoga, a hedge fund that engaged in a "first loss" trading strategy.  First-loss trading strategies utilize third-party investment managers who enjoy considerable discretion to invest fund assets.  Unlike traditional hedge funds, the investment managers for first-loss hedge funds (aka "traders") are required to contribute a portion of the fund's overall capital (usually 10%), with the remainder of the capital coming from the fund's limited partner investors.  In the event that the fund experiences a loss, the loss is

4

covered first by the trader's contribution, before impacting the capital of the fund's limited partners.  If the fund experiences a gain, the trader gets to share in the profits at a percentage higher than both the fund's limited partners and the standard industry standard for traditional hedge funds.

16.      According to Conestoga's 2006 private placement memorandum ("PPM"), Conestoga LLC served as the General Partner of Conestoga and was responsible for management activities, record retention, and supervision of the fund's service providers.  Conestoga LLC was, in turn, comprised of four individuals, including Mr. Carrow, Mr. Heckler, Richard Williams, and Francis Grimes.  Mr. Heckler was responsible for all of Conestoga's investment activities and Mr. Carrow was responsible for all of Conestoga's administrative functions (*i.e.*, the "Managing Member").

17.      Upon information and belief, Mr. Carrow was Conestoga's accountant through his own firm, Carrow, Doyle & Associates ("CDA"), which served as the fund's auditor until about 2009.  CDA was responsible for, among other things, auditing the fund's financial statements and issuing Form K-1 tax statements ("K-1") to the limited partners.  K-1s are part of a partnership tax return that reports to the individual investors the components of taxable income for which they are responsible and includes appreciation or loss and any expenses of the capital account for that particular year.

**Ms. Bedell's Early Relationship with Messrs.
Heckler and Carrow and her Conestoga Investments**

18.      In or around 2002, Ms. Bedell was introduced to Mr. Heckler by another Conestoga investor.

19.      According to Mr. Heckler and Mr. Carrow, Conestoga was a safe fund that focused on transparency and preservation of capital, and was generally only available to a group

of select investors consisting of friends and family members of the partners.  Mr. Heckler further represented to Ms. Bedell that Conestoga was his principal/sole focus—he had no other investment funds.

20.     Ms. Bedell relied on these representations (which Mr. Heckler, Mr. Carrow, and Ms. Smith repeated on numerous occasions) in deciding to invest $750,000 in Conestoga in 2004.  Ms. Bedell's initial investment was a "trial" investment—she wanted to gauge Conestoga's performance and security before making any considerable investment, including any investments on behalf of her children's trusts.

21.     As time went on, Ms. Bedell's trust and confidence in Mr. Heckler, Ms. Smith, and Mr. Carrow grew, as did her capital account balance.  Indeed, during this time period, Ms. Bedell received numerous reports and account statements showing both the fund's liquidity and steady growth in her investments.

22.     As a result, between 2004 and 2010, upon the recommendations of Mr. Heckler and Mr. Carrow, Ms. Bedell made a series of investments in Conestoga in separate limited partner accounts: $3,354,374.46 in her personal account; $300,000 in account on behalf of her IRA; $164,154.72 as Trustee of the Landon Bedell Trust; and $164,154.72 as Trustee of the Keaton Bedell Trust.

23.     Beginning in or around October of 2010, Ms. Bedell also invested in Green Mountain via Topwater—a real estate investment fund managed by Travis Taylor ("Mr. Taylor"), Bryan Borgia ("Mr. Borgia"), and Tim O'Shea ("Mr. O'Shea")—based on Mr. Heckler's recommendation.  In total, Ms. Bedell invested in two separate Green Mountain share classes: $608,198 in Green Mountain "Discount;" and $2,000,000 in Green Mountain "B Shares.

According to her agreement with Conestoga, Ms. Smith assisted Ms. Bedell in transferring these funds into a side pocket investment[1] separate and apart from her other Conestoga investments.

**Mr. Heckler and Ms. Smith Convince Ms. Bedell
to Transfer the Bulk of her Assets into their Funds**

24.     As time went on, Ms. Bedell's investments in Conestoga appeared to be winners—she was earning steady, consistent returns and had been receiving funds within thirty days of her redemption requests.

25.     Sometime in 2010, however, Conestoga's growth stalled.  Although Mr. Heckler and Ms. Smith assured Ms. Bedell that this was just a temporary hurdle caused by investor liquidations following the 2008 financial crisis, they explained that that they had formed two new hedge funds to combat the slowdown: Cassatt and CV Opportunities (collectively, the "Funds").

26.     According to Ms. Smith[2], Cassatt was a "safe" investment with "very high levels of liquidity and very high levels of transparency."  Cassatt consisted of twenty-five to thirty traders who executed one trade—the parity trade.  As Mr. Heckler would later explain, the parity trade allowed traders to buy and sell stocks on a priority basis ahead of other traders.  Cassatt LLC, which would serve as Cassatt's General Partner, would be run by Mr. Carrow and Mr. Heckler as the managing members.

27.     CV Opportunities, on the other hand, was designed to "invest in undervalued and discounted assets, including common stocks, private placement partnerships, direct loan portfolios, restricted securities of publicly traded companies and various real estate assets."  CV

---

[1] According to the PPM, limited partners could invest in a specific investment vehicle within Conestoga that was accounted for separately than the remainder of the limited partners investments through a "side pocket."

[2] Most, if not all, electronic mail communications concerning the formation of Cassatt and CV Opportunities copied Ms. Smith, Mr. Carrow, and Mr. Heckler.

LLC served as the CV Opportunities General Partner with Ms. Smith acting as the managing member.

28.     According to Ms. Smith, Mr. Heckler would lead the traders in both Cassatt and CV Opportunities as he was "meticulous" and would ensure that Ms. Bedell was "cared for in the future," Ms. Smith would continue to serve as the funds' administrator and broker-dealer, and Mr. Carrow would "oversee" CV Opportunities work.

29.     To facilitate the transition of Ms. Bedell's Conestoga investments, Ms. Smith and Mr. Heckler further suggested that Ms. Bedell's Green Mountain distributions be paid directly to CV Opportunities.  According to Ms. Smith, Mr. Heckler worked with Mr. Taylor at TopWater and Green Mountain "on a regular basis" in Pennsylvania and could easily facilitate the transfer.

30.     Ms. Smith and Mr. Heckler further informed Ms. Bedell that, in order to obtain her investment records from banks and other independent investment firms that were then holding her funds and assets, Ms. Bedell would need to execute a limited power of attorney naming Mr. Heckler and Ms. Smith her attorneys-in-fact.

31.     Thereafter, on November 23, 2010, Ms. Bedell agreed that her Green Mountain distributions be paid directly to CV Opportunities and executed the limited power of attorney naming Mr. Heckler and Ms. Smith her attorneys-in-fact.

32.     By November 24, 2010, Ms. Bedell had transferred her remaining assets in Conestoga to CV Opportunities, including the Conestoga assets owned by Ms. Bedell's IRA, the Keaton Bedell Trust, and the Landon Bedell Trust.

33.     Following the transfers, Ms. Bedell received documents titled "Fund Capital Summary," which purported to reflect the returns on Ms. Bedell's investments in CV

Opportunities and Cassatt, as well as a "Master Position List," which purported to provide the current asset value of each of her holdings.

34.    As of November 30, 2010, Ms. Bedell's "Master Position List" showed that Ms. Bedell had successfully transferred the following Conestoga investments to CV Opportunities. Specifically, Ms. Bedell transferred:

| Linda Bedell (personal account) | $4,078,734.52 |
| Linda Bedell IRA | $479,902.36 |
| Landon Bedell Trust | $150,897.19 |
| Keaton Bedell Trust | $150,897.19 |

**Mr. Carrow's Purported Disassociation with the Funds and
the Beginning of Ms. Bedell's Relationship with Citrin Cooperman**

35.    In or around January 2010, CDA combined with Citrin Cooperman.  As a result, Mr. Carrow and Ms. Smith informed Ms. Bedell that Mr. Carrow would no longer have any direct involvement with any of the Funds.  Instead, Ms. Smith's firm, CV Administration, LLC, would be generating the Funds' monthly statements and reports.  As detailed below, this representation was false, as Mr. Carrow continued to support Ms. Smith and the Funds though at least 2018 by, among other things, promoting the Funds to his clients at Citrin Cooperman.

36.    In light of Ms. Bedell's relationship with Mr. Carrow, however, Mr. Carrow and Ms. Smith suggested that Ms. Bedell retain Citrin Cooperman to serve as her personal accountant and tax advisor.  According to Defendants, Mr. Carrow's familiarity with the Funds in which Ms. Bedell was invested was extremely valuable.  Specifically, Mr. Carrow claimed that his prior involvement as General Partner provided him with unique insight that would allow him to assist Ms. Bedell with her personal finances.  Furthermore, Mr. Carrow claimed that since he was no

longer "directly" involved with the Funds as an investor or partner, he could act as a zealous advocate for Ms. Bedell.

37.     Ms. Bedell accepted Mr. Carrow's offer and retained Citrin Cooperman to serve as her personal accountant and tax advisor in or around 2011.  Thereafter, Ms. Bedell worked extensively with Mr. Carrow and Matt Lakofsky ("Mr. Lakofsky") regarding her taxes and finances, essentially turning control over to Citrin Cooperman.  Mr. Lafosky had previously worked with Mr. Carrow at CDA.  Additionally, Ms. Smith frequently arranged and participated in calls with Mr. Carrow and Ms. Bedell about her personal finances, taxes, and overall investment mix.

38.     Upon information and belief, Mr. Carrow's and Ms. Smith's statements about Mr. Carrow's disassociation with Ms. Smith's and Mr. Heckler's Funds were false.  Indeed, Mr. Heckler later informed Ms. Bedell that Mr. Carrow had _not_ severed ties with the Funds and was often working at Ms. Smith's offices between 2015 and 2017.  And, unbeknownst to Ms. Bedell, Citrin Cooperman had an "arrangement" with Ms. Smith and Mr. Heckler.  Specifically, Mr. Heckler later informed Ms. Bedell that Citrin Cooperman billed the Funds _directly_ for a portion of Ms. Bedell's personal accounting and tax work.  Upon information and belief, payments made by the Funds for Ms. Bedell's personal accounting and tax work were reflected on Ms. Bedell's Citrin Cooperman invoices as a "courtesy discount."

39.     Furthermore, and unbeknownst to Ms. Bedell, Mr. Carrow and Citrin Cooperman had become embroiled in a lawsuit involving Hawk Opportunity Fund, L.P., another one of Ms. Smith's investment funds.  See Lieberman v. Hawk Management, L.P., No. 12-CV02778, 2012 WL 6067596 (E.D.Pa. 2012).  That Complaint alleges, in relevant part, that Mr. Carrow and Citrin Cooperman acted as Hawk Management's independent auditor and played a role in

withholding fund documentation from the limited partner plaintiff who was attempting to redeem his investments pursuant to the Hawk Management's limited partnership agreement.  See, e.g., id. at ¶¶ 68-70.

40.     Upon information and belief, Mr. Carrow and Ms. Smith were involved in a romantic relationship at that time and were engaged to be married.

**Citrin Cooperman Takes Over
as the Funds' "Independent" Auditor**

41.     Around the same time that Ms. Bedell retained Citrin Cooperman to act as her personal accountants and tax advisors, Ms. Smith informed Ms. Bedell that Citrin Cooperman had also been retained to act as Cassatt's and CV Opportunities' independent auditor and would generate her K-1 tax statements.[3]

42.     Throughout the course of performing audit and tax work for Cassatt and CV Opportunities, individuals at Citrin Cooperman had direct communications with Ms. Bedell concerning her investments and capital account balances.  Indeed, on or about March 7, 2013, Denise Kopyar at Citrin Cooperman sent Ms. Bedell an email asking her to confirm her contributions in and withdrawals from Cassatt for December 31, 2011 through December 31, 2012 in connection with Citrin Cooperman's audit of Cassatt's financial statements for the fiscal years ending December 31, 2011 and 2012.

43.     Although Citrin Cooperman acted as the Funds' independent auditor for years, however, the results of its year-end audits were rarely shared with Ms. Bedell, save the 2012 audit report for Cassatt dated May 17, 2013 (the "2012 Audit Report").

---

[3] Although Citrin Cooperman was retained to provide audit and tax work for the Funds, Ms. Bedell is unaware to what extent that work was performed despite Mr. Carrow's and Ms. Smith's representations about the work that was being performed.

44.     The 2012 Audit Report, which was specifically addressed to the "Partners" of Cassatt, stated that Cassatt's financial statements "present fairly, in all material respects, the financial position of Cassatt Short Term Trading Fund, LP, as of December 31, 2012, and the results of their operation, the changes and their cash flows for the year then ended in accordance with accounting principles generally accepted in the United States of America."  Citrin Cooperman further asserted that it believed that "the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion."

45.     According to the 2012 Audit Report, the fair value of Cassatt's total assets was $45,451,676, including $26,453,469 (approximately 34% of the total assets) which had been invested in four private investment companies, three of which were identified: Coastal Partners, LP, Topwater Exclusive Fund III, and Aequitas Income Protection Fund, LLC.

46.     Throughout the term of Citrin Cooperman's engagement as auditor, and beyond, Ms. Bedell and Mr. Carrow discussed Ms. Bedell's investments in Cassatt and CV Opportunities.  Specifically, Mr. Carrow told Ms. Bedell that her investments were secure, but that he would work on identifying the appropriate pension plan to maximize Ms. Bedell's investments.  To that end, Citrin Cooperman compiled all of Ms. Bedell's tax returns and assisted her in setting up the Inner Design, Inc. Profit Sharing Plan and two Qualified Personnel Residence Trusts ("QPRT"), which would later invest in the Funds.

47.     Additionally, Mr. Carrow told Ms. Bedell that, although Cassatt had experienced a "below average" month, he had spoken with Mr. Heckler who had explained that there were other trading strategies "in the pipeline" that would improve the Funds' performance.  Put differently, Mr. Carrow assured Ms. Bedell that her investments were secure based on his access

to confidential information concerning the Funds' investments and trading strategies, as well as his direct communications with Ms. Smith and Mr. Heckler.

**The Wholesale Liquidation and Transfer of
Ms. Bedell's Assets into Cassatt and CV Opportunities**

48.     Over the years, Ms. Bedell continued to make investments in Cassatt and CV Opportunities.  Specifically, Ms. Bedell made the following additional investments in the Funds on behalf of several different vehicles:

49.     Additionally, between September 11 and 16, 2014, Mr. Carrow (in his capacity as Ms. Bedell's tax advisor at Citrin Cooperman), Mr. Heckler, and Ms. Smith facilitated the liquidation and transfer of Ms. Bedell's investments in Cassatt to CV Opportunities as follows:

| | |
|---|---|
| Linda Bedell (personal account) | $3,474,536.10 |
| Linda Bedell 12 Year QPRT | $2,784,624.19 |
| Linda Bedell 15 Year QPRT | $2,784,624.18 |
| Inner Design Profit Sharing Plan | $54,161.00 |

50.     Regarding Ms. Bedell's investment in Green Mountain, Ms. Smith informed Ms. Bedell that that Topwater was going to liquidate Green Mountain and distribute the remaining assets in 2011.  According to Ms. Smith, Mr. Heckler was working with Mr. Taylor and Mr. O'Shea to facilitate the liquidation in Pennsylvania.

51.     In early 2012, Mr. Heckler told Ms. Bedell that Green Mountain would begin making liquidation distributions over the following months and that Ms. Bedell would receive her money shortly.  According to Ms. Smith and Mr. Heckler, Ms. Bedell's Green Mountain distributions would be wired directly to her CV Opportunities personal account.  At that time,

Ms. Bedell held approximately $2,561,507.29 in Green Mountain "B Shares" and $609,317 in Green Mountain "Discount Shares."

52.     In 2014, Ms. Smith informed Ms. Bedell that Mr. Heckler had been personally involved with TopWater in the Green Mountain liquidation and that, with the exception of one distribution, those funds had been transferred to her CV Opportunities personal account.  As Ms. Bedell would later learn, however, these statements were false.  Ms. Bedell's Green Mountain distributions were not being transferred to her CV Opportunities personal account.  Rather, upon information and belief, Topwater and Green Mountain transferred those payments directly to Ms. Smith and Mr. Heckler who used those distributions for their own, personal expenses.

**Mr. Heckler Informs Ms. Bedell That
He is Retiring and Winding Down the Funds**

53.     Year after year, Mr. Heckler and Ms. Smith provided Ms. Bedell with statements demonstrating her investments steady and consistent growth.  Specifically, Defendants provided Ms. Bedell with the Master Position Summary Sheets that showed the following growth associated with each separate account:

|  | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|
| Inner Design | $233,527.11 | $279,680.47 | $298,001.76 | $313,489.12 | $324,123.08 |
| Linda Bedell | $12,436,727.96 | $14,966,876.60 | $23,156.749.78 | $24,044,630.88 | $22,824,797.63 |
| Landon Bedell | $178,212.76 | $165,457.11 | $174,274.29 | $183,331.44 | $189,550.27 |
| Keaton Bedell | $168,445.46 | $176,029.78 | $187,561.13 | $196, 308.81 | $204,001.78 |
| Linda Bedell IRA | $772,131.92 | $828,892.89 | $888,197.97 | $929,092.06 | $960,608.06 |

54.     In addition to the Master Position Summary Sheets, Mr. Heckler, Ms. Smith, and Mr. Carrow consistently reassured Ms. Bedell that her investments were earning "steady" and "consistent" returns year after year.

55.     Despite the Funds' success, however, Mr. Heckler told Ms. Bedell in or around September 2017 that he was tired of the investment business, that he wanted to give his money to charity, and that he would be returning the limited partners', including Ms. Bedell's, investments over the course of the next year.  At the same time, Mr. Heckler also offered to help Ms. Bedell set up her own accounts with some of the traders that he had worked with him over the years and spent several phone calls explaining to Ms. Bedell and her son, Keaton, how to set up and manage the accounts.

56.     Shortly thereafter, in or around December 2017, Mr. Heckler informed Ms. Bedell that Ms. Smith had purportedly "resigned" from her role as the Funds' administrator, and reiterated that he was beginning the process of closing down Cassatt and CV Opportunities over the course of the next year.  According to Mr. Heckler, Ms. Smith had left Mr. Heckler a disc containing all of the Funds' accounting information and had provided him with access the Funds' bank accounts with PNC Bank ("PNC").

**Mr. Heckler's and Mr. Carrow's Agreement
Concerning the "Carrow Group" of Investors**

57.     Unbeknownst to Ms. Bedell, Mr. Heckler was not winding down the funds because he had grown "tired of the investment business."  To the contrary, there were significant issues with Cassatt and CV Opportunities as early as the Spring or Summer 2017 that had been concealed from the limited partners, including Ms. Bedell.

58.     As a result, Mr. Heckler and Mr. Carrow came up with a plan pursuant to which certain select limited partners, referred to in internal email communications as members of the

"Carrow Group," were to be paid before any other limited partners, irrespective of the formal redemption procedures set forth in Cassatt's and CV Opportunities' PPMs.  Upon information and belief, the "Carrow Group" consisted of select Citrin Cooperman clients, Mr. Heckler's and Mr. Carrow's family members, and Mr. Grimes and his family members.

59.     Mr. Grimes is an attorney who had been involved with Mr. Heckler, Mr. Carrow, and Ms. Smith's scheme from the very beginning.  Indeed, Mr. Grimes was listed in the 2006 Conestoga PPM as one of the fund's managing members and had, upon information and belief, provided legal services to Ms. Smith, Mr. Carrow, and Mr. Heckler throughout the years.  For example, Mr. Carrow helped Ms. Smith, Mr. Heckler, and Mr. Carrow by acting as counsel for a limited partner investor who was having trouble redeeming her investment from the Funds in order to pacify the limited partner and stave off the scheme's collapse.[4]

60.     According to Mr. Heckler's and Mr. Carrow's plan, Mr. Heckler was to make payments to members of the Carrow Group before any other limited partner investor, regardless of whether they had submitted timely formal redemption requests as required by the limited partnership agreements.  Upon information and belief, Mr. Grimes and Mr. Carrow suggested that Mr. Heckler establish a "reserve" for the "Carrow people" and that Mr. Heckler use Mr. Grimes' attorney escrow account to make the distributions.

61.     Ms. Bedell was not part of the Carrow Group.  Indeed, Mr. Heckler and Mr. Carrow discussed Ms. Bedell and the requirement to pay members of the Carrow Group before Ms. Bedell.  In that same email, Mr. Heckler explained that he had gone to great lengths to

---

[4] Although Ms. Bedell was told differing accounts of Mr. Grimes' involvement from Mr. Heckler and Mr. Carrow, Mr. Carrow told Ms. Bedell that he had recommended an attorney to one of his Citrin Cooperman clients who was having trouble redeeming her investments from the Funds.  When Ms. Bedell asked Mr. Carrow for the name of that attorney, however, he refused to disclose Mr. Grimes' identity to Ms. Bedell.  Internal e-mail communications between Mr. Heckler and Mr. Grimes indicate that Mr. Grimes was the attorney referenced by Mr. Carrow.

protect Mr. Carrow's "people," including Mr. Grimes, and that Mr. Heckler, Ms. Smith, and Mr. Carrow should get together to come up with a game plan before speaking with Ms. Bedell.

**Ms. Bedell Tries to Redeem Her Investments and Mr. Heckler**
**Offers his Personal Assets to Serve as Collateral for Her Redemptions**

62.     In early 2018, Ms. Bedell was expecting an orderly and complete liquidation of all her assets.  Ms. Bedell did not, however, submit formal redemption requests at that time in light of Mr. Heckler's representations about winding down the Funds and returning the limited partners', including Ms. Bedell's, investments.  As the months passed, however, Mr. Heckler offered a variety of excuses as to why the monies were not forthcoming.

63.     Specifically, Mr. Heckler explained that pursuant to the Funds' PPMs, investors with valid earlier redemptions would be given priority over other investors, such as Ms. Bedell, who had sought to redeem their investments later.  Mr. Heckler further told Ms. Bedell that she could "trust" him and that she shouldn't worry.

64.     Given the fact that the repayment of her funds was not underway by mid-2018, and the revelation that Ms. Bedell was the largest investor in the Funds, Ms. Bedell submitted formal redemption requests for her accounts.  Ms. Bedell further suggested that, at the very least, Mr. Heckler begin to return her money in installment payments of $1 million, each month.

65.     Thereafter, Mr. Heckler transferred $1 million dollars to Ms. Bedell in June 2018, but failed to make any subsequent payments.

66.     On July 1, 2018, in response to Ms. Bedell's repeated inquiries regarding the status of her redemptions, Mr. Heckler offered to provide Ms. Bedell with collateral as "security until all of [her] accounts have been liquidated and returned."  Specifically, Mr. Heckler offered to (i) "provide [his] personal assets to fully collateralize [Ms. Bedell's] accounts until [] [she was] completely liquidated in cash;" and (ii) "[s]et up a business meeting at [Ms. Bedell's]

convenience to show [her] the specifics of the process." Mr. Heckler's only condition, however, was that Ms. Bedell keep the details of their asset assignment arrangement (the "Asset Assignment Agreement") confidential.

67.     A true and accurate copy of Mr. Heckler's July 1, 2018 email is attached hereto as Exhibit A.

68.     On July 15, 2018, Mr. Heckler sent Ms. Bedell a copy of the executed Asset Assignment Agreement pursuant to which Mr. Heckler purportedly assigned "all rights, title, interest, and obligations in, and under" the following assets: "HM Waterfall Participation" and "Computer Source Code ETF Premarket Strategy." According to Mr. Heckler, these assets were equal to Ms. Bedell's investments in Cassatt and CV Opportunities.

69.     A true and accurate copy of the executed Asset Assignment Agreement is attached hereto as Exhibit B.

70.     Thereafter, Ms. Bedell repeatedly requested K-1s for the Funds from Mr. Heckler throughout 2018. Mr. Heckler, however, repeatedly made excuses and stalled in providing her K-1s. Finally, in the fall 2018, Mr. Lakofsky sent Ms. Bedell draft copies of K-1s for the calendar year ending 2017 that Mr. Heckler had provided from Daniel Island Accounting Solutions, LLC in Charleston, South Carolina. According to the draft K-1s, which understated Ms. Bedell's investments, Ms. Bedell's capital account balances were as follows:

| Account | Capital Account Balance |
|---|---|
| Linda Bedell (Personal Account) | $23,507,818 |
| Linda Bedell IRA | $937,176 |

18

| Inner Design Profit Sharing Plan | $316,217 |
|---|---|
| Keaton Bedell Irrevocable Trust | $199,025 |
| Landon Bedell Irrevocable Trust | $184,925 |

71.     On December 7, 2018, Ms. Bedell sent Mr. Carrow an email inquiring as to whether Mr. Carrow had ever formally resigned from his role as the General Partner of Cassatt. Specifically, Ms. Bedell explained that the fund subscription documents identified Mr. Carrow as the Managing Member of the General Partner—not Mr. Heckler.

72.     Mr. Carrow responded that his name had been stamped on the Cassatt documents "without his permission" and that Citrin Cooperman had severed all formal ties with the Funds. Despite these representations, however, Mr. Carrow had been copied on numerous communications concerning Ms. Bedell's investments in the Funds, including the initial e-mails soliciting the transfers.  He had also been, as late as fall 2017, promoting Ms. Smith and the Funds, and representing that he had been putting his own clients in those investments at a time when Ms. Bedell believed that he had disassociated.

73.     Mr. Carrow went on to tell Ms. Bedell that he no longer spoke with Ms. Smith because his new wife "did not like it."  Mr. Carrow further explained that one of his friends who was having difficulties getting Mr. Heckler and Mr. Smith to return his investments had hired an attorney who had helped him recover his money.  When Ms. Bedell asked, however, that Mr. Carrow give her the name of the attorney so that she could retain him to assist her in recovering her investments, he refused.  According to Mr. Carrow, the attorney did not want Mr. Carrow to disclose his name to Ms. Bedell.

**Mr. Heckler Purportedly Retains Attorney**
**Lawrence McMichael to Represent the Funds**

74.     In December 2018, Mr. Heckler told Ms. Bedell and her attorney, Richard A.

Knezevich, that he was going to hire an attorney to work with all of the limited partners to ensure

that everyone received information equally and that the remaining funds would be distributed on

a pro rata basis.

75.     Thereafter, On January 19, 2019, Mr. Heckler retained Mr. McMichael to

purportedly advise him regarding the orderly dissolution of the Funds and distribution of the

remaining Fund assets to the limited partner investors.

76.     Mr. McMichael has over forty-two years commercial litigation experience and is

a partner at Dilworth Paxson, a law firm with offices in four states.

77.     In mid-January 2019, Ms. Bedell spoke with Mr. McMichael.  During that

conversation, Mr. McMichael stated that he was just starting his preliminary investigation but

that he would follow-up with Ms. Bedell shortly.

78.     On or about January 23, 2019, Mr. McMichael sent out a "status report" on the

investments managed by Mr. Heckler (the "First Status Report").  In that Report, Mr. McMichael

stated that he had been retained to advise Mr. Heckler regarding the orderly dissolution of the

Funds that he managed and the distribution of Fund assets to investors.  The Report further stated

that Mr. Heckler had agreed to engage accountants for the Funds and that all material

developments relating to the work of the accountants and Mr. McMichael's assessment of the

funds would be shared with investors, including Ms. Bedell.

79.     A true and accurate copy of the First Status Report is attached hereto as Exhibit C.

20

80.     On January 29, 2019, Mr. McMichael sent Ms. Bedell an email explaining that Mr. Heckler had assembled all of the bank statements for the Funds and that both he and Mr. Heckler would be meeting with the accountants later that week to go over the records.

81.     On February 6, 2019, Mr. McMichael sent out a second status report (the "Second Status Report"), wherein he represented that Mr. Heckler had retained Marcum LLP, an accounting firm, to review the funds books and records.  The Report further stated that Mr. McMichael was in possession of all of the Funds' "accounting information, bank statements, brokerage statements, and the like" via "dropbox."

82.     A true and accurate copy of the Second Status Report is attached hereto as Exhibit D.

83.     Upon information and belief, the Funds' "accounting information, bank statements, [and] brokerage statements" mentioned in the Second Status Report were woefully deficient and insufficient to even qualify as the Funds' records despite Mr. McMichael's representation to the contrary.

84.     On February 22, 2019, Mr. McMichael sent out a third status report (the "Third Status Report").  The Report explained that Marcum had completed its initial review of all of the information provided by Mr. Heckler and had compiled a list of additional information needed "to bring all accounts current."

85.     A true and accurate copy of the Third Status Report is attached hereto as Exhibit E.

86.     Over the course of the following weeks, Ms. Bedell attempted to reach Mr. McMichael by phone to discuss the funds records and the Third Status Report to no avail.  Ms. Bedell did, however, exchange emails with Mr. McMichael concerning another lawsuit filed

against Mr. Heckler in California concerning another fund called the "Innovative Funds" (the "Innovative Complaint").  Mr. McMichael acknowledged the Innovative Complaint but explained that it was "a back burner issue" in light of what they were working on at that time.

87.     A true and accurate copy of the Innovative Complaint filed in the action captioned as Innovative Fund I, LP v. Heckler, et. al, No. 2019-01053812 (Cal. Sup. 2019) is attached hereto as Exhibit F.

88.     The allegations set forth in the Innovative Complaint, however, highlight the breadth of Mr. Heckler's misrepresentations to Ms. Bedell for years.

89.     Indeed, despite his representations to the contrary, Mr. Heckler had also founded, owned and/or controlled various different investment entities including, among others, TA1, LLC, School Street Capital, LLC, CVAF 1, LLC, and GBP1, LLC, which Mr. Heckler utilized for making and managing his various investments.  Of particular significance, the Innovative Complaint chronicles Mr. Heckler's commingling and use of limited partner funds for improper purposes and undisclosed trading strategies, and identifies a series of notes and revolving lines of credit extended to Mr. Heckler on behalf of his various entities.

90.     Additionally, the Innovative Complaint details how Cassatt had "become an investor in Innovative" and that funds belonging to other entities in which Mr. Heckler was involved were used to pay Cassatt limited partner redemptions.

91.     On or about March 12, 2019, Mr. McMichael sent a fourth status report (the "Fourth Status Report"), which explained that Mr. McMichael's goals were to (i) "report [] an approximate asset value based on current and reliable information," (ii) "provide an accurate statement of your capital account and associate tax information for 2018," and (iii) promptly liquidate the Funds and make a distribution [] in accordance with the Fund documents."  The

Report went on, however, to state that Mr. McMichael was "not happy with the timeline in achieving the stated goals" and that he has "adopted a far more aggressive approach to obtaining the information. . . ."

92.     A true and accurate copy of the Fourth Status Report is attached hereto as Exhibit G.

93.     Around that same time, Mr. Heckler informed Ms. Bedell that he had not received her formal redemption requests sent earlier that year.  As a result, on March 28, 2019, Ms. Bedell sent Mr. Heckler and Ms. Smith a second copy of the formal requests to liquidate all of her accounts and redeem her investments.

94.     Shortly thereafter, Ms. Bedell discovered from Timothy O'Shea at Green Mountain that a number of her Green Mountain distributions had not been paid into CV Opportunities, as Mr. Heckler and Ms. Smith had assured her.  Indeed, Mr. O'Shea provided Ms. Bedell with an accounting of her Green Mountain distributions over the years.  Along with the $1,501,934.14 that was still owed to Ms. Bedell, approximately $359,738.49 in distributions were unaccounted for.  When pressed for more information about Green Mountain and the remaining monies to due to Ms. Bedell, however, Mr. O'Shea became unresponsive.

95.     Around that same time, Mr. Heckler told Ms. Bedell that, whether "he ends up in jail or not," his goal was to deliver "as much restitution" as possible.  That said, he claimed that all of the funds' remaining assets were wrapped up together, could not be distributed easily, and that he would have to speak further to Mr. McMichael before moving forward with distributions. According to Mr. Heckler, Mr. McMichael had instructed Mr. Heckler to "keep his mouth shut, don't say anything, and keep moving forward."

96.     In or around June of 2019, Ms. Bedell demanded again that Mr. Heckler honor his commitment and turn over the personal assets that he had pledged to her under the Asset Assignment Agreement—some of the very same assets that Mr. Heckler had pledged in connection with his dealings with the Innovative Fund.

97.     In one of many conversations discussing the Asset Assignment, Mr. Heckler told Ms. Bedell: "Why don't you call your lawyer and sue me and collect on that. You'll have a rude awakening, Linda."

98.     Ultimately, Mr. Heckler refused to tender to Ms. Bedell the assets he pledged under the Asset Assignment Agreement. Nor has Mr. Heckler paid Ms. Bedell her redemptions. Furthermore, Mr. McMichael's demeanor toward Ms. Bedell began to change. Indeed, Mr. McMichael has grown increasingly hostile toward Ms. Bedell—he told her that he represented Mr. Heckler (not her) and that he didn't have any obligation to look out for her best interest.

99.     To date, Ms. Bedell has not received her redemptions, and Mr. Heckler and Mr. McMichael have ceased communicating with her about the status of the Funds and her distributions.

**FINRA Investigates Ms. Smith and Bars Her from the Securities Industry**

100.    The Financial Industry Regulatory Authority ("FINRA") recently investigated Ms. Smith in connection with Ms. Smith's registered broker dealer, CV Brokerage, Inc.

101.    FINRA documents dated May 23, 2019 describe the investigation as follows:

> Non-compliance with FINRA Rules 8210 and 2010 in that Ms. Smith failed to provide documents and information requested in connection with a FINRA investigation into potential misstatements about the financial performance of an investment fund that were made during the course of private securities transactions in which Ms. Smith participated.

102.    On July 2, 2019, FINRA barred Ms. Smith from the securities industry.

24

**Ms. Smith is Arrested and Charged with Securities and Wire Fraud**

103.     On August 27, 2019, Ms. Smith was arrested by the Federal Bureau of

Investigation and charged with four counts of wire fraud and one count of securities fraud in

connection with another hedge fund she owned and operated.

104.     According to the August 27, 2019 press release issued by United States Attorney

for the District of New Jersey (who is handling the criminal prosecution).

105.     Smith orchestrated a scheme using her investment fund, Broad Reach Capital, in

which she lied to investors about the assets and performance of the fund and falsely stated that

she would invest their funds in particular trading strategies.  Smith collected more than $100

million in investments.  Instead of investing the money as she promised, she diverted millions of

dollars of investor funds out of Broad Reach Capital for other purposes, including paying other

investors.

**The Securities and Exchange Commission Sue Ms. Smith**
**and Freeze Her Assets and the Bank Accounts of Her Various Entities**

106.     On August 27, 2019, the Securities Exchange Commission ("SEC") filed a civil

complaint for securities fraud against Ms. Smith and Broad Reach Capital, LP ("BRC"), a hedge

fund that was owned and controlled by Ms. Smith.

107.     The SEC Complaint alleges that:

a.     "To solicit and retain investors, Defendants represented that [BRC] employed
several profitable, sophisticated trading strategies involving highly liquid
securities, including those that it was uniquely positioned to pursue because of its
access to the Philadelphia Stock Exchange trading floor ('Trading Strategies').  In
reality, only a small fraction of investor money was actually used for these
strategies."  (SEC Complaint ¶ 4).

b.     "The vast majority of the funds were moved through the bank accounts of entities
Smith controls and ultimately used to, among other things, make her own personal
investments and to repay other investors.  To lull existing investors and solicit

additional investments, Defendants provided monthly account statements reflecting high returns and 'tear sheets' touting the Fund's overall claimed 30%+ yearly return and that the Fund had never had a losing month.  These and other performance statements were false."  (SEC Complaint ¶ 5).

c.   "[S]ince [BRC's] inception, Smith used over $2 million of the Fund's assets (filtered through three of her entities) to pay American Express bills.  None of this capital was engaged in the claimed profitable Trading Strategies."  (SEC Complaint ¶ 25).

d.   "[A]lthough investors contributed approximately $105 million to [BRC], the high point of all brokerage and bank accounts in the name of [BRC] and its purported affiliates was no more than $31.8 million in December 2016."  (SEC Complaint ¶ 26).

108.   Ms. Smith is currently being detained pending her criminal trial.

109.   It was not until the commencement of the SEC action on August 27, 2019, the filing of the Innovative Complaint on July 29, 2019, and receipt of a limited number of internal communications between Mr. Carrow and Mr. Heckler in July 2020, that Ms. Bedell learned that Defendants had used her funds for improper purposes or otherwise dissipated her investments.

**Defendants Acted with Scienter**

110.   Defendants knew that the statements that they made to Ms. Bedell to induce her investments were false.

111.   Specifically, Mr. Heckler and Mr. Carrow knew, among other things, that:

a.   Conestoga did not utilize a "first loss" trading strategy and Ms. Bedell's Conestoga interests were not transferred to CV Opportunities and Cassatt.

b.   Mr. Heckler owned, managed, or controlled a number of different investment funds—not just Conestoga.

c.   Cassatt and CV Opportunities were not engaged in the trading strategies represented to Ms. Bedell.  Instead, they were engaging in related party transactions, issuing loans to affiliates based on phony promissory notes, and transferring funds to other entities in violation of the Funds' PPMs.  This included transactions with, among others, TA1, LLC and the Innovative Fund.

d.  The financial performance data provided for Conestoga, Cassatt, and CV Opportunities that was provided to Ms. Bedell was false.

e.  The Master Summary Sheets, which purported to reflect the balance of Plaintiffs' investments, were false.

f.  Ms. Bedell's Green Mountain distributions were not being paid to her investment account at CV Opportunities.  Instead, Ms. Smith, Mr. Heckler, and Mr. Carrow misappropriated and misused the proceeds from Ms. Bedell's Green Mountain distributions for their own personal with Green Mountain and Top Water's knowledge and agreement.

g.  Mr. Carrow had not disassociated with the Funds when he joined Citrin Cooperman.  Instead, Mr. Carrow remained involved with the Funds which included, among other things, promoting/soliciting new limited partner investments from Citrin Cooperman clients.

h.  Citrin Cooperman did not have access to confidential information concerning the Funds' investments and trading strategies.

## CAUSES OF ACTION

### COUNT I
### (Violations of 70 P.S. §§ 1-401 and 1-501 of the Pennsylvania Securities Act Against Mr. Heckler)

112.    Ms. Bedell repeats, realleges, and incorporates the allegations set forth in the Paragraphs above as if restated in full herein.

113.    At all times relevant herein, Mr. Heckler made, approved, and disseminated untrue statements of material fact or omitted to state material facts necessary in order to make the statements made not misleading, in connection with the sale and purchase of limited partnership interests in Conestoga, Cassatt, and CV Opportunities to Ms. Bedell in Pennsylvania.

114.    Specifically, Mr. Heckler falsely represented to Ms. Bedell in connection with her purchase of limited partnership interests in Conestoga, Cassatt, and CV Special Opportunities that: (i) Conestoga utilized a "first loss" trading strategy that provided monthly liquidity to its investors; (ii) CV Opportunities invested in undervalued and discounted assets; (iii) Cassatt

27

utilized a very short term trading strategies with a concentration in equity securities; (iv) that by using these strategies, Conestoga, Cassatt, and CV Opportunities historically had consistent profitable returns; (v) Mr. Carrow was not directly involved in Cassatt and CV Opportunities; and (vi) Cassatt and CV Opportunities were overseen at all times by a third-party independent auditor, Citrin Cooperman, who had access to confidential information concerning the Funds' investments and trading strategies.

115.    These statements were materially false and misleading when issued because Mr. Heckler knew that: (i) the Funds never intended to follow the investment objectives, strategies and methods that they claimed to be following; (ii) that Cassatt and CV Opportunities were not following the investment objectives, strategies and methods that they claimed to be following; (iii) that the bulk of Conestoga, Cassatt's, and CV Opportunities' assets were moved to other accounts and/or treated inconsistently with the disclosed investment objectives, strategies and methods; and (iv) that they had not taken any real procedures, including use of an independent third-party accountant to assure that Conestoga's, Cassatt's, and CV Opportunities' investments were supported by real assets and transactions.

116.    In purchasing and holding Conestoga, Cassatt, and CV Opportunities securities in Pennsylvania, Ms. Bedell relied directly on the false and misleading statements and omissions made by Mr. Heckler.  Ms. Bedell acquired Conestoga, Cassatt, and CV Opportunities shares without knowledge that Mr. Heckler had misstated or omitted material facts.

117.    Ms. Bedell would not have purchased Conestoga, Cassatt, and CV Opportunities shares in the quantities she purchased, at the prices she paid, or at all, if she had been aware that the market prices had been artificially and falsely inflated by Mr. Heckler's misleading statements.

118.    As a direct and proximate result of Mr. Heckler's conduct, Ms. Bedell has suffered damages in an amount to be proven at trial, plus pre-judgment and post-judgment interest, punitive damages, costs and such other relief as the Court determines to be necessary.

## COUNT II
### (Fraud Against Mr. Heckler, Mr. Carrow, Cassatt, and CV Opportunities)

119.    Ms. Bedell repeats, realleges, and incorporates the allegations set forth in the Paragraphs above as if restated in full herein.

120.    As set forth more fully above, Mr. Heckler, Mr. Carrow, Cassatt, and CV Opportunities knowingly made numerous false and misleading statements of material fact to Ms. Bedell and omitted to state material facts regarding Conestoga's, Cassatt's, and CV Opportunities' operations, investment strategy, and liquidity, as well as the performance of Ms. Bedell's investments.

121.    Specifically, Mr. Heckler, Mr. Carrow, Cassatt, and CV Opportunities materially misrepresented, among other things that: (i) Conestoga utilized a "first loss" trading strategy that provided monthly liquidity to its investors; (ii) CV Opportunities invested in undervalued and discounted assets; (iii) Cassatt utilized a very short term trading strategies with a concentration in equity securities; (iv) by using these strategies, Conestoga, Cassatt, and CV Opportunities historically had consistent profitable returns; (v) Mr. Carrow was not directly involved in Cassatt and CV Opportunities; (vi) Cassatt and CV Opportunities were overseen at all times by a third-party independent auditor, Citrin Cooperman, who had access to confidential information concerning the Funds' investments and trading strategies; and (vii) that Ms. Bedell's prior investments were secure and growing each month.

122.    Mr. Heckler and Mr. Carrow made these misrepresentations in, among other places, emails to Ms. Bedell as alleged in detail above, and written and oral presentations.

123.     When they made their false statements and committed their omissions, Mr. Heckler and Mr. Carrow knew facts or had access to information suggesting that their public statements were not accurate or failed to check information they had a duty to monitor and which would have demonstrated the falsity of their statements.

124.     Ms. Smith, Mr. Heckler, and Mr. Carrow made the false representations knowing of their falsity and with the intent to induce Ms. Bedell to rely upon the false representations in deciding to invest in Conestoga, Cassatt, and CV Opportunities.

125.     Ms. Smith, Mr. Heckler, and Mr. Carrow knew these representations were false when made and that Ms. Bedell would rely on these representations in deciding to invest in Conestoga, Cassatt, and CV Opportunities.

126.     Ms. Bedell reasonably relied on these representations in making her initial investments in Conestoga, Cassatt, and CV Opportunities, and could not, through the exercise of reasonable diligence, discover that these representations were false.

127.     As a direct and proximate result, Ms. Bedell has suffered damages in an amount to be proven at trial.

### COUNT III
**(Aiding and Abetting Fraud Against Citrin Cooperman)**

128.     Ms. Bedell repeats, realleges, and incorporates the allegations set forth in the Paragraphs above as if restated in full herein.

129.     As detailed above, Ms. Smith, Mr. Heckler, and Mr. Carrow perpetrated a massive fraud that included, among other things, making material misrepresentations about Conestoga, Cassatt, and CV Opportunities in order to induce Ms. Bedell, to invest, make additional investments, or remain invested in Conestoga, Cassatt, and CV Opportunities.

130.    Ms. Smith's, Mr. Heckler's, and Mr. Carrow's representations about Conestoga, Cassatt, and CV Opportunities were material to Ms. Bedell's decision to invest, remain invested, and make additional investments in Conestoga, Cassatt, and CV Opportunities.

131.    Specifically, Citrin Cooperman knew—based on its independent review of Cassatt's underlying financial records, including actual trading records and account statements, and Mr. Carrow's personal knowledge and access to information—that (i) Cassatt was not following the investment objectives, strategies and methods represented to Ms. Bedell; (ii) the bulk of Cassatt's assets were moved to other accounts and/or treated inconsistently with the disclosed investment objectives, strategies and methods; (iii) Cassatt was not utilizing a third-parties to assure that Cassatt's investments were supported by real assets and transactions; and (iv) Cassatt did not offer monthly liquidity to investors.

132.    Citrin Cooperman knowingly provided substantial assistance and encouragement to Mr. Heckler and Ms. Smith in effecting the fraud by, inter alia: (i) issuing a clean audit report for Cassatt that it knew was materially false and misleading for the year ending December 31, 2016; and (ii) purporting to act as Ms. Bedell's personal accountant and tax advisor, which included providing various services and assurances to Ms. Bedell which purported to confirm that her investments were secure and under appropriate management.

133.    Citrin Cooperman knew that Ms. Bedell would rely upon the audit report and oral and written statements of Citrin Cooperman employees, including Mr. Carrow, in deciding to invest in Cassatt, maintain her investments in Cassatt, and make additional investments in Cassatt and CV Opportunities.  Specifically, Citrin Cooperman knew that the report it issued was the principal means by which investors were induced to purchase limited partnership interests,

and not to redeem their shares, in that there was no other purportedly independently-verified information available to investors upon which they could rely.

134.    As alleged herein, Citrin Cooperman's reckless statements and representations aided and abetted the fraud.  Citrin Cooperman recklessly disregarded numerous red flags, as previously described, and engaged in acts and omissions constituting a gross departure from professional standards of care for an independent administrator.  Citrin Cooperman's breaches of these standards of care, and its grossly negligent and reckless disregard for its professional standards and obligations, gave substantial assistance to Ms. Smith's, Mr. Heckler's, and Mr. Carrow's accomplishment of the fraud.

135.    The conduct of Citrin Cooperman, in substantially assisting and aiding and abetting Ms. Smith's, Mr. Heckler's, and Mr. Carrow's fraud, as set forth above, was malicious, willful, wanton, and oppressive, and in reckless disregard of the rights of Ms. Bedell, thereby warranting the imposition of punitive damages against Citrin Cooperman in addition to the compensatory damages in accordance with the proof at trial.

136.    As a direct and proximate result of Citrin Cooperman's acts in furtherance of Ms. Smith's fraud, Ms. Bedell has suffered damages in an amount to be proven at trial.

## <u>COUNT IV</u>
### (Breach of Fiduciary Duty Against Citrin Cooperman)

137.    Ms. Bedell repeats, realleges, and incorporates the allegations set forth in the Paragraphs above as if restated in full herein.

138.    Citrin Cooperman, as Ms. Bedell's personal accountant and tax advisor, owed Ms. Bedell fiduciary duties.  Ms. Bedell placed her complete trust and confidence in Citrin Cooperman, and Citrin Cooperman had influence and superiority over Ms. Bedell based on her longstanding relationship with Mr. Carrow and Mr. Lakofsky.  Thus, Citrin Cooperman owed

Ms. Bedell the duties of honesty, loyalty, care, and compliance with the applicable codes of professional responsibility.

139.    Citrin Cooperman breached its fiduciary duties to Ms. Bedell by, among other ways:

   a.   Failing to advise Ms. Bedell that Mr. Carrow was still involved with the Funds and, therefore, was operating under a conflict of interest;

   b.   Failing to advise Ms. Bedell that it was recommending investments in the Funds to other clients; and,

   c.   Advising Ms. Bedell about her personal finances, taxes, and overall investment mix—including that her investments were "secure" and showing continual growth—despite Mr. Carrow's conflict of interest.

140.    As a result of Citrin Cooperman's conduct set forth herein, Ms. Bedell has suffered injury in that she (i) paid significant fees to Citrin Cooperman, and (ii) transferred millions of dollars in investments to the Funds for tax purposes.

141.    As a direct and proximate result of Citrin Cooperman's breach of fiduciary duty, Ms. Bedell has suffered damages in an amount to be proven at trial.

## <u>COUNT V</u>
**(Aiding and Abetting Breach of Fiduciary Duty Against Citrin Cooperman)**

142.    Ms. Bedell repeats, realleges, and incorporates the allegations set forth in the Paragraphs above as if restated in full herein.

143.    In acting or purporting to act as Partners and Managing Members of the Funds, Mr. Heckler and Ms. Smith owed a fiduciary duty to Ms. Bedell.

144.    In addition, Ms. Bedell entrusted her investments to Mr. Heckler and Ms. Smith, who had substantial discretion and control over the Funds' investment activities and assets, Ms. Bedell's investments, and the Funds' communications to Ms. Bedell.  This discretion and control

gave further rise to a fiduciary duty and duty of care on the part of Mr. Heckler and Ms. Smith to Ms. Bedell.

145.   Citrin Cooperman was aware of the fiduciary duties owed by Mr. Heckler and Ms. Smith to Ms. Bedell as alleged above.  Specifically, Citrin Cooperman knew that:

     a.  Mr. Heckler and Ms. Smith had discretion and control giving rise to a fiduciary duty and duty of care to Ms. Bedell;

     b.  Mr. Heckler and Ms. Smith occupied a superior position over Ms. Bedell with respect to their management and control over Ms. Bedell's investments in the Funds and had control and superior access to confidential information about the investments and assets of the Funds; and,

     c.  Mr. Heckler's and Ms. Smith's superior position necessitated that Ms. Bedell repose her trust and confidence in Mr. Heckler and Ms. Smith to fulfill their duties, and that Ms. Bedell did so by investing in the Funds.

146.   Cirtin Cooperman was further aware that Ms. Bedell reasonably and foreseeably relied on such representations, and trusted Mr. Heckler's and Ms. Smith's purported expertise and skill.

147.   Mr. Heckler and Ms. Smith breached their fiduciary duties to Ms. Bedell by, *inter alia,* operating a Ponzi scheme from 2006 through 2019, unlawfully withdrawing investor funds, including Ms. Bedell's, for their personal benefit.

148.   Citrin Cooperman knowingly provided substantial assistance and encouragement to Mr. Heckler and Ms. Smith in effecting their breaches of fiduciary duty by, *inter alia,* purporting to provide accounting services for the Funds and vouching for the Funds' performance.  Specifically, Mr. Carrow, in his role as Ms. Bedell's personal accountant and tax advisor, assured Ms. Bedell that her investments were secure and under appropriate management.  Indeed, Mr. Carrow touted Citrin Cooperman's expertise related to the Funds based on his prior involvement as General Partner.

149.    As a direct and proximate cause of (i) Mr. Heckler's and Ms. Smith's breaches of their fiduciary duties, and (ii) Citrin Cooperman's aiding and abetting those breaches, Ms. Bedell has suffered substantial damages in an amount to be determined at trial.

## COUNT VI
**(Breach of Contract Against Mr. Heckler)**

150.    Ms. Bedell repeats, realleges, and incorporates the allegations set forth in the Paragraphs above as if restated in full herein.

151.    The Asset Assignment Agreement is a valid and binding contract between Ms. Bedell and Mr. Heckler.

152.    Ms. Bedell fully performed under the LPA and Redemption Agreement.

153.    Mr. Heckler breached the Asset Assignment Agreement by failing to convey the assets to Ms. Bedell on demand.

154.    As a direct and proximate result of Mr. Heckler's breach of the Asset Assignment Agreement, Ms. Bedell has suffered damages in an amount to be proven at trial.

## COUNT VII
**(Aiding and Abetting Fraud Against TopWater and Green Mountain)**

155.    Ms. Bedell repeats, realleges, and incorporates the allegations set forth in the Paragraphs above as if restated in full herein.

156.    As detailed above, Ms. Smith, Mr. Heckler, and Mr. Carrow perpetrated a massive fraud that included, among other things, making material misrepresentations about Ms. Bedell's investments in Green Mountain, which were managed by Topwater.  Specifically, Ms. Smith and Mr. Heckler told Ms. Bedell that Mr. Heckler was working to facilitate liquidated of

the Fund, when they were instead using Ms. Bedell's distributions from Green Mountain for their own, personal expenses.

157.     Green Mountain and Topwater knowingly provided substantial assistance and encouragement to Mr. Heckler, Mr. Carrow, and Ms. Smith in effecting the fraud by, *inter alia,* transferring Ms. Bedell's distribution payments directly to Ms. Smith and Mr. Heckler who used those distributions for their own, personal expenses.

158.     As a direct and proximate cause of (i) Mr. Heckler's and Ms. Smith's fraud, and (ii) Green Mountain's and Topwater's aiding and abetting that fraud, Ms. Bedell has suffered substantial damages in an amount to be determined at trial.

## JURY DEMAND

Plaintiffs demand trial by jury on all counts for which a jury trial is permitted.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

A.     Preliminarily enjoin Defendants from conveying, transferring, alienating, selling, hypothecating, encumbering, disposing or paying any accounts, payables or other sums, amounts, income or funds up to the amount of $ 35 million;

B.     Order a general attachment on all assets of Defendants in the amount of $35 million;

C.     Award Plaintiffs damages in the amount of $35 million;

D.     Award Plaintiffs prejudgment and post judgment interest;

E.      Award Plaintiffs reasonable attorneys' fees and costs; and,

F.      Award such other relief as the Court deems just and proper.


           <u> /s/ Ira Neil Richards     </u>
           David Smith (Pa. ID No. 21480)
           Ira Neil Richards (Pa. ID No. 50879)
           Daniel P. Lawn (Pa. ID No. 326114)
           SCHNADER HARRISON SEGAL & LEWIS LLP
           1600 Market Street, Suite 3600
           Philadelphia, PA 19103
           Telephone: (215) 751-2503
           irichards@schnader.com

           <u>ATTORNEYS FOR PLAINTIFF</u>

*Pro hac vice* pending:
William C. Nystrom
Dana A. Zakarian
Nina S. Hirsch
John Nucci
NYSTROM BECKMAN & PARIS LLP
One Marina Park Drive, 15th Floor
Boston, MA 02210
Telephone: (617) 778-9100
wnystrom@nbparis.com
dzakarian@nbparis.com
nhirsch@nbparis.com

Dated: August 5, 2020