UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LINDA BEDELL, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>GEORGE HECKLER, *et al.*,<br><br>Defendants. | **Civil Action No. 2:20-cv-03804-WB** |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT MARK S. CARROW'S MOTION TO DISMISS**

# **TABLE OF CONTENTS**

Table of Authorities ................................................................................................................... ii

Introduction ................................................................................................................................1

Background ................................................................................................................................3

Ms. Bedell's Early Investments and Mr. Carrow's Role in the Fraud ........................................3

Mr. Carrow Convinces Ms. Bedell to Hire Citrin as Plaintiffs'
Personal Accountant and Tax Advisor .......................................................................................5

Citrin Takes Over as Independent Auditor for Cassatt and CV Opportunities ..........................5

Mr. Carrow Advises Plaintiffs to Pump Money into His Fraudulent Funds ..............................6

The Defendants' Scheme Begins to Implode .............................................................................7

Cassatt and CV Opportunities Are Revealed to be Ponzi Schemes ...........................................7

Argument ...................................................................................................................................8

I.   The Amended Complaint Adequately Alleges the
Elements of Mr. Carrow's Fraud .........................................................................................8

A.  Mr. Carrow Misstates the Rule 9(b) Pleading Standard .....................................................9

B.  The Amended Complaint Adequately Alleges Fraud ......................................................10

C.  The Amended Complaint Sufficiently Describes Mr. Carrow's
Numerous False Statements .............................................................................................13

Conclusion ...............................................................................................................................15

# TABLE OF AUTHORITIES

Cases                                                                                                                   Page(s)

Bell Atl. Corp. v. Twombly,
   550 U.S. 544 (2007) ............................................................................................................. 9

Berger v. Safemasters Co., Inc.,
   1986 WL 15025 (E.D. Pa. 1986) ........................................................................................ 14

DiVittorio v. Equidyn Extractive Industries, Inc.,
   822 F.2d 1242 (2d Cir. 1987) ............................................................................................. 11

Dolan v. PHL Variable Insurance Co.,
   2016 WL 6879622 (M.D. Pa. Nov. 22, 2016) .................................................................... 13

Elbeco Inc. v. Estrella de Plato Corp.,
   989 F. Supp. 669 ................................................................................................................. 14

Foglia v. Renal Ventures Mgmt., LLC,
   754 F.3d 153 (3d Cir. 2014) ............................................................................................... 10

Fox Fuel, a Div. of Keroscene, Inc. v. Delaware County Schools Joint Purchasing Bd.,
   858 F. Supp. 945 (E.D. Pa. 1994) ....................................................................................... 13

Gohil v. Sanofi-Aventis U.S. Inc.,
   96 F. Supp. 3d 504 (E.D. Pa. 2015) ............................................................................... 4, 11

Hayes v. Am. Int'l Grp.,
   2009 WL 4591531 (E.D. Pa. Nov. 30, 2009) .................................................................... 12

Holst v. Oxman,
   2006 WL 724520 (E.D. Pa. Mar. 17, 2006) ....................................................................... 11

In re Am. Travellers Corp. Securities Litig.,
   806 F. Supp. 547 (E.D. Pa. 1992) ....................................................................................... 12

In re Catanella & E.F. Hutton & Co., Inc. Sec. Litig.,
   583 F. Supp. 1388 (E.D. Pa. 1984) ............................................................................. 3, 4, 10

In re Sunrise Sec. Litig.,
   793 F. Supp. 1306 (E.D. Pa. 1992) ................................................................................ 4, 10

Killbride Investments Ltd. v. Cushman & Wakefield of Pennsylvania, Inc.,
   294 F. Supp. 3d 369 (E.D. Pa. 2018) .................................................................................... 9

Mills v. Polar Molecular Corp.,
    12 F.3d 1170 (2d Cir. 1993) ........................................................................................ 13

Padalino v. The Standard Fire Ins. Co.,
    616 F. Supp. 2d 538 (E.D. Pa. 2008) ............................................................................. 9

Phillips v. County of Allegheny,
    515 F.3d 224 (3d Cir. 2008) .......................................................................................... 9

Rosenbaum & Co. v. H.J. Myers & Co.,
    1997 WL 689288 (E.D. Pa. Oct. 9, 1997) ................................................................... 13

Schatzberg, D.C. v. State Farm Mutual Auto. Ins. Co.,
    877 F. Supp. 2d 232 (E.D. Pa. 2012) ............................................................................. 3

Thomas v. Siemens AG,
    2010 WL 1711775 (E.D. Pa. Apr. 26, 2010) ............................................................... 12

United States ex rel. Bookwalter v. UPMC,
    946 F.3d 162 (3d Cir. 2019) ........................................................................................ 10

Waterfront Renaissance Assocs. v. City of Philadelphia,
    701 F. Supp. 2d 633 (E.D. Pa. 2010) ........................................................................... 16

Rules

Federal Rule of Civil Procedure 9(b) ....................................................................... Passim

Federal Rule of Civil Procedure 12(b)(6) ......................................................................... 9

# INTRODUCTION

Plaintiff Linda Bedell ("Ms. Bedell") alleges in the Amended Complaint that Defendant Mark Carrow ("Mr. Carrow"), while serving as defendant Citrin Cooperman and Company, LLP's ("Citrin") managing partner, victimized his own clients (which he himself called the "Carrow Group"), and perpetrated a decade-long Ponzi scheme that drained Ms. Bedell of her entire life savings. One co-conspirator, George Heckler ("Mr. Heckler") has already stipulated to liability and a $26 million judgment resulting from the fraud (see ECF 33), while another co-conspirator, Brenda Smith ("Ms. Smith"), sits in jail awaiting trial for Federal wire and mail fraud charges. Mr. Carrow, on the other hand, is taking a different path, seeking to escape liability for his key role in this massive fraud—promoting the Ponzi scheme and feeding his own clients, including Ms. Bedell, into it—by closing his eyes to the Amended Complaint's well pled allegations against him. (Mot. 9).

As detailed herein, however, the Amended Complaint specifically describes Mr. Carrow's conduct against Ms. Bedell, including:

- Promoting a Ponzi scheme (which he himself managed) to his own clients, including Ms. Bedell, while serving as Citrin's managing partner, which both abused his position of trust and constituted massive conflicts of interest.

- Assuring Ms. Bedell that Cassatt Short Term Trading Fund, LP ("Cassatt") and CV Special Opportunity Fund, LP ("CV Opportunities") (together, the "Funds") were executing "parity" trades and investing in "undervalued and discounted assets," which they decidedly were not. (Am. Compl. ¶¶ 26-27, 32, 121-22).

- Stating to Ms. Bedell in 2010 that he had disassociated with the Funds and would not have any direct involvement with them while serving as Citrin's managing partner. (Id. ¶¶ 35-36). And Mr. Carrow further told Ms. Bedell that his "independence" from and "unique insight" into the Funds would allow him to serve as her personal accountant without any conflict of interest. (Id. ¶¶ 36, 38, 57, 61, 72). All of these statements were false. (Id. ¶ 38). In fact, Mr. Carrow served as the Funds' Managing Member and General Partner *for years* after he told Ms. Bedell he had disassociated with the Funds and continued to actively promote the funds to both Ms. Bedell and other Citrin clients. (See id. ¶¶ 38, 71-72).

- Representing to Ms. Bedell throughout 2014 that "her investments were secure" based on his access to purported confidential information concerning the Funds, which induced Ms. Bedell to hold and make additional investments in the Funds. (Id. ¶¶ 46-50, 57-60, 111). Indeed, Mr. Carrow even recommended certain vehicles to hold Ms. Bedell's investments and subsequently assisted her in organizing a pension plan, the Inner Design, Inc. Profit Sharing Plan, ("Inner Design") to make additional investments in the Funds in 2014. (Id. ¶ 46).

- Stating to Ms. Bedell in 2014 that Cassatt had other trading strategies "in the pipeline" that would improve the Fund's performance following a "below average" month. (Id. ¶ 47). Ms. Bedell was considering liquidating her investments in Cassatt but decided to hold her investments based on Mr. Carrow's representation, which was false. (Id.).

- Concealing from Plaintiffs the serious issues that arose with the Funds in 2017. (Id. ¶ 57). Rather than informing Ms. Bedell that the Funds were on the brink of collapse—and exposing them as fraudulent—Mr. Carrow reassured Ms. Bedell about the Funds' performance to keep her at bay while he and Mr. Heckler put in motion a plan to redeem select limited partners, referred to in emails between Mr. Carrow and Mr. Heckler as the "Carrow Group." (Id. ¶¶ 57-58, 60).

The allegations surpass Fed. R. Civ. P. 9(b) requirements that a claim "adequately delineates the acts and transactions constituting fraud to apprise defendants fairly of the claim, and . . . [is] sufficiently clear to enable defendants to answer." Schatzberg, D.C. v. State Farm Mutual Auto. Ins. Co., 877 F. Supp. 2d 232, 248 n.7 (E.D. Pa. 2012). Simply put, the Amended Complaint, which describes Mr. Carrow's central role in the fraud and recites his numerous misstatements and when he made them, is more than sufficient. See In re Catanella & E.F. Hutton & Co., Inc. Sec. Litig., 583 F. Supp. 1388, 1397 (E.D. Pa. 1984) (Rule 9(b) "generally deemed satisfied where the complaint details the time, place, substance of the alleged misrepresentations, as well as the identity of the individual perpetrating the fraud.").

Mr. Carrow's attempt to hold Plaintiffs to an impossible standard of pleading—under which Plaintiffs are forced to recall and plead precise and intimate details about every misstatement made to them over a decade—is a tactic that is routinely rejected by courts. In fact, Rule 9(b) gives plaintiffs leeway where, as here, the fraud at issue took place over an extended

period of time. In re Catanella, 583 F. Supp at 1398 ("When the transactions [at issue] are numerous and take place over an extended period of time, less specificity is required."). Simply put, courts follow the public policy that a fraudster should not escape liability merely because a plaintiff cannot recall unreasonably specific details. See Gohil v. Sanofi-Aventis U.S. Inc., 96 F. Supp. 3d 504, 517 (E.D. Pa. 2015) ("Instead of focusing exclusively on the particularity language [of 9(b)], a district court must keep in mind the general simplicity and flexibility contemplated by the rules"); In re Sunrise Sec. Litig., 793 F. Supp. 1306, 1312 (E.D. Pa. 1992) ("Focusing exclusively on the particularity requirement is too narrow an approach and fails to take account of the general simplicity and flexibility contemplated by the rules. Instead . . . the fraud allegations must withstand a case-specific evaluation, made with a view to the policies to be served by Rule 9(b)"). This is particularly true where, as here, Mr. Carrow's misstatements, conduct, and omissions all demonstrate his knowing participation in a Ponzi scheme. For these same reasons, the Court should deny Mr. Carrow's Motion.

## BACKGROUND

**Ms. Bedell's Early Investments and Mr. Carrow's Role in the Fraud**

Mr. Carrow is an accountant with over thirty years of experience, and the founding partner of Carrow, Doyle & Associates ("CDA"). (Am. Compl. ¶¶ 7, 17, 35). In or around 2010, CDA merged with Citrin, after which Mr. Carrow became the managing partner of Citrin's Philadelphia office. (Id. ¶¶ 7, 35).[1] Mr. Heckler is a trader who ran a series of hedge funds based in Pennsylvania. (Id. ¶¶ 18, 25). As detailed herein, Mr. Carrow ran the Ponzi scheme out of Citrin's offices and pumped millions of dollars of his own client's money (which he called the "Carrow Group") through it to keep it from collapsing for several years.

---

[1] Upon information and belief, Mr. Carrow served as the managing partner of Citrin's office until sometime in June of 2020, just two months before Plaintiffs filed their Complaint. (See ECF 1).

3

Ms. Bedell met Mr. Carrow and Mr. Heckler in 2002 in connection with a hedge fund called Conestoga Partners Holdings, LP ("Conestoga"). (Id. ¶ 18). Mr. Carrow formed Conestoga in 1998 to engage in a "first loss" trading strategy. (Id. ¶ 15). According to Mr. Carrow and Mr. Heckler, Conestoga was a safe investment available only to an exclusive group of investors, which consisted of Mr. Heckler's and Mr. Carrow's friends and family members. (Id. ¶ 19).

Mr. Carrow was Conestoga's managing member, Mr. Heckler was in charge of its investments, and Ms. Smith[2] was responsible for back-office services. (Id. ¶¶ 16, 23, 35). In addition to his role as a managing member, Mr. Carrow also served as Conestoga's accountant through CDA, which was responsible for auditing the fund's financial statements and issuing Form K-1 tax statements ("K-1s") to limited partners. (Id. ¶ 17).

Ms. Bedell first invested $750,000 in Conestoga in 2002. (Id. ¶ 20). As time went on, Ms. Bedell's trust and confidence in Mr. Heckler, Mr. Carrow, and Ms. Smith grew, as did her capital account balance. (Id. ¶ 21). Between 2004 and 2010, Ms. Bedell invested nearly $4 million in Conestoga personally, on behalf of her Individual Retirement Account ("IRA"), and as trustee of two trusts for her sons, Landon and Keaton. (Id. ¶ 22).

In early 2010, Mr. Carrow, Mr. Heckler, and Ms. Smith formed two new funds: Cassatt Short Term Trading Fund, LP ("Cassatt") and CV Special Opportunity Fund, LP ("CV Opportunities") (together, the "Funds"). (Id. ¶ 25). Similar to Conestoga, Mr. Carrow ran Cassatt, Ms. Smith ran CV Opportunities, and Mr. Heckler was in charge of the Funds' investments. (Id. ¶¶ 7, 26-28).

---

[2] Ms. Smith managed several funds based in Pennsylvania. (Am. Compl. ¶¶ 25, 35). Ms. Smith has been federally indicted for wire and securities fraud in connection with a similar Ponzi scheme. (Id. ¶¶ 103-109).

4

### Mr. Carrow Convinces Ms. Bedell to Hire Citrin as Plaintiffs' Personal Accountant and Tax Advisor

In early-mid 2010, Mr. Carrow informed Ms. Bedell that CDA was merging with Citrin. (Am. Compl. ¶ 35). As a result, Mr. Carrow said he would no longer have any involvement with Cassatt and CV Opportunities but recommended that Ms. Bedell hire Citrin as her personal accountant and tax advisors in connection with her investments. (Id. ¶¶ 35-36). According to Mr. Carrow, his time with Conestoga provided him with unique insight into the Funds' management and investments that would allow him to assist Ms. Bedell with her personal finances. (Id. ¶ 36). Moreover, Mr. Carrow claimed that because he no longer had any direct involvement with the Funds, he could zealously advocate for Ms. Bedell as her personal accountant without any conflict of interest. (Id.). As detailed below, all these assurances were false. (See id. ¶ 38). In fact, Mr. Carrow was listed as the Managing Member and General Partner in fund documents *for years* after his purported disassociation with the Funds. (See id. ¶¶ 38, 71). And he continued to promote the Funds to his clients virtually until they collapsed.

Ms. Bedell hired Citrin as her personal accountant and tax advisors in 2011. (Id. ¶ 37). Over the years, Ms. Bedell worked extensively with Mr. Carrow and Matt Lakofsky, another former CDA employee who worked with Mr. Carrow at Citrin. (Id.). Mr. Carrow also scheduled conference calls with Ms. Smith and Ms. Bedell to discuss Ms. Bedell's personal finances and ways to legally mitigate tax exposure in light of her investment portfolio. (Id.).

### Citrin Takes Over as Independent Auditor for Cassatt and CV Opportunities

In or around 2011, Citrin took over as Cassatt's and CV Opportunities' independent auditor. (Am. Compl. ¶ 41). Throughout the course of performing audit and tax work for Cassatt and CV Opportunities, Mr. Carrow and other Citrin employees communicated directly with Ms. Bedell about Plaintiffs' investments, including confirming the amounts of Plaintiffs'

5

investments and withdrawals. (Id. ¶ 42).

Citrin issued an audit report for Cassatt dated May 17, 2013 (the "2012 Audit Report"). (Id. ¶ 43). The 2012 Audit Report, which was specifically addressed to Cassatt's "Partners," stated that Cassatt's financial statements "present fairly, in all material respects, the financial position of Cassatt [], as of December 31, 2012, and the results of their operation, the changes and their cash flows for the year then ended in accordance with accounting principles generally accepted in the United States of America." (Id. ¶ 44). According to the 2012 Audit Report, Cassatt was a safe, secure fund with $45,451,676 in assets under management ("AUM"). (Id. ¶ 45). As Plaintiffs would later learn, however, there was no basis whatsoever for this valuation. (Id. ¶¶ 78-84, 111).

Moreover, throughout the term of Citrin's engagement as the Funds' independent auditor, Ms. Bedell and Mr. Carrow discussed Ms. Bedell's investments in the Funds. (Id. ¶ 46). Specifically, Mr. Carrow assured Ms. Bedell that Plaintiffs' investments were secure based on his access and review of confidential information about the Funds, but that he would work on identifying the appropriate pension plan to maximize Ms. Bedell's investments. (Id. ¶¶ 46-47).

**Mr. Carrow Advises Plaintiffs to Pump Money into His Fraudulent Funds**

As time went on, and as Plaintiffs' investments in the Fund appeared to be earning steady returns, Ms. Bedell placed her complete trust in Citrin, and eventually gave Mr. Carrow access and control over the majority of her financial assets and investments. (Am. Compl. ¶¶ 21, 37). Indeed, Mr. Carrow recommended certain vehicles to hold Plaintiffs' investments and subsequently assisted Ms. Bedell in organizing a pension plan, the Inner Design, Inc. Profit Sharing Plan, ("Inner Design") to make additional investments in the Funds. (Id. ¶ 46). And, in 2014, when Ms. Bedell was considering liquidating her investments in Cassatt due to a "below

6

average" month, Mr. Carrow reassured Ms. Bedell that there were other trading strategies "in the pipeline" that would improve the Fund's performance. (Id. ¶ 47).

Unbeknownst to Ms. Bedell, the Funds directly paid Citrin for Ms. Bedell's personal accounting and investment-related tax work, reflected on her invoices as a "courtesy discount." (Id. ¶ 38). These payments demonstrate Citrin's (and Mr. Carrow's) complicity in the scheme. (Id.).

**The Defendants' Scheme Begins to Implode**

In the first half of 2017, there were significant liquidity issues with Cassatt and CV Opportunities. (Am. Compl. ¶ 57). Mr. Carrow, however, concealed these issues from Ms. Bedell so that he and Mr. Heckler could pay "preferred" investors and leave others, like Plaintiffs, holding the bag. (Id. ¶¶ 58,60). These preferred investors (who were referred to in internal emails as the "Carrow Group") consisted of select Citrin clients as well as family members of Mr. Heckler and Mr. Carrow. (Id. ¶ 58, 60).

Mr. Carrow's and Mr. Heckler's emails (which were sent to and from Mr. Carrow's Citrin email address) laid out their plan to redeem the Carrow Group without following the procedures set forth in Cassatt's and CV Opportunities' operating documents. (Id. ¶ 58, 60).

Ms. Bedell was not part of the Carrow Group. (Id. ¶ 61). In fact, Mr. Heckler and Mr. Carrow discussed Ms. Bedell and the requirement to pay members of the Carrow Group before Ms. Bedell. (Id. ¶ 61). Indeed, Mr. Heckler explained that he had gone to great lengths to protect Mr. Carrow's "people" and that Mr. Heckler, Ms. Smith, and Mr. Carrow should get together to come up with a game plan before speaking with Ms. Bedell. (Id. ¶ 61).

**Cassatt and CV Opportunities Are Revealed to be Ponzi Schemes**

In early-mid 2019, Ms. Bedell submitted formal redemption requests for her accounts.

(Am. Compl. ¶ 93). After a lengthy process, which included piecemeal payments but ultimately ended without payment of their entire redemptions, Plaintiffs were forced to bring this suit after learning that Ms. Smith was arrested and charged with securities fraud on August 27, 2019. (Id. ¶¶ 64-65, 103-109). It is now apparent that Cassatt and CV Opportunities were Ponzi schemes that Defendants ran for nearly a decade. (See Id.).

## ARGUMENT

### I.  The Amended Complaint Adequately Alleges the Elements of Mr. Carrow's Fraud

"When evaluating a motion to dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(6), [the court] must accept as true all factual allegations set forth in the complaint." Padalino v. The Standard Fire Ins. Co., 616 F. Supp. 2d 538, 541 (E.D. Pa. 2008). The plaintiff must assert factual allegations that are "enough to raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). In other words, stating a claim "requires a complaint with enough factual matter (taken as true) to suggest the required element." Phillips v. County of Allegheny, 515 F.3d 224, 234 (3d Cir. 2008).

To state a claim for fraud, a plaintiff must allege: "1) a misrepresentation, 2) material to the transaction, 3) made falsely, 4) with the intent of misleading another to rely on it, 5) justifiable reliance resulted, and 6) injury was proximately caused by the reliance." Killbride Investments Ltd. v. Cushman & Wakefield of Pennsylvania, Inc., 294 F. Supp. 3d 369, 381 (E.D. Pa. 2018). In doing so, the plaintiff must "state with particularity the circumstances constituting [the] fraud []." Foglia v. Renal Ventures Mgmt., LLC, 754 F.3d 153, 155 (3d Cir. 2014); Fed. R. Civ. P. 9(b).

### A. Mr. Carrow Misstates the Rule 9(b) Pleading Standard

Mr. Carrow seeks to hold Plaintiffs to a higher pleading standard than Rule 9(b) requires. Specifically, he argues that Plaintiffs must "allege the date, time and place for when or where or how each of the two defendants allegedly made each statement." (Mot. 9). According to Mr. Carrow, Plaintiffs must plead the precise circumstances of every false statement made to them over the course of a scheme that lasted more than a decade. (See id. 7-10). Unsurprisingly, Rule 9(b) does not require this impossible standard of pleading.

Instead, Rule 9(b) merely requires that Plaintiffs allege the "who, what, when, where, and how of the *events at issue*." United States ex rel. Bookwalter v. UPMC, 946 F.3d 162, 176 (3d Cir. 2019) (emphasis added); see In re Catanella, 583 F. Supp. at 1398 (complaint that "details the time, place, substance of the alleged misrepresentations, as well as the identity of the individual perpetrating the fraud" is sufficient). It does *not* require Plaintiffs to allege "the date, time, place, or content of every single allegedly false [statement]." Bookwalter, 946 F.3d at 176. This is particularly true where, as here, the fraud at issue took place over the course of years. See In re Catanella, 583 F. Supp at 1398 ("When the transactions [at issue] are numerous and take place over an extended period of time, less specificity is required"). The policy undergirding these rules seeks to avoid the exact scenario Mr. Carrow seeks to create here: allowing a fraudster to escape liability unless an aggrieved plaintiff can remember the precise time of day a false statement was made to her over a decade ago. See In re Sunrise Sec. Litig., 793 F. Supp. at 1312.

Contrary to Mr. Carrow's assertions, the key question in deciding whether a pleading is sufficient is whether plaintiff pled "the circumstances constituting fraud with particularity . . . to place the defendants on notice of the precise misconduct with which they are charged, and to

9

safeguard defendants against spurious charges of immoral and fraudulent behavior." Gohil, 96 F. Supp. 3d at 517. See also Holst v. Oxman, 2006 WL 724530, at *3 (E.D. Pa. Mar. 17, 2006) (same); DiVittorio v. Equidyn Extractive Industries, Inc., 822 F.2d 1242, 1247 (2d Cir. 1987) ("Where multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud.").

### B. The Amended Complaint Adequately Alleges Fraud

Here, the Amended Complaint provides ample notice of the allegations levied against Mr. Carrow. Indeed, the Amended Complaint details Mr. Carrow's role in perpetrating this massive fraud, which spanned a decade—and explains how he used his position of trust as the managing partner of Citrin's Philadelphia office to induce his clients to keep investing funds so that the Ponzi schemes would not collapse. The Amended Complaint further describes Mr. Carrow's fraudulent statements, actions, and omissions in furtherance of the Ponzi schemes. For example, the Amended Complaint alleges that:

- Mr. Carrow used Conestoga to convince Ms. Bedell to invest $750,000 as a "trial" investment and ultimately win her trust. (Am. Compl. ¶¶ 19-21). Based on recommendations Mr. Carrow made between 2004 and 2010, Ms. Bedell invested millions into Conestoga. (Id. ¶¶ 21-23). Mr. Carrow, alongside Mr. Heckler and Ms. Smith—both of whom were Mr. Carrow's co-conspirators—would later convince Plaintiffs to transfer those investments into Cassatt and CV Opportunities and subsequently steal millions. (Id. ¶¶ 24-34).

- Along with Ms. Smith, Mr. Carrow told Ms. Bedell that Cassatt executed "parity" trades and CV Opportunities invested in "undervalued and discounted assets" in 2011. (Id. ¶¶ 26-27, 32). Neither Fund, however, executed such trading. (Id. ¶¶ 111(c), 121-22). Instead, Cassatt and CV Opportunities were engaging in related party transactions, issuing loans to affiliates based on phony promissory notes, and transferring funds to other entities in violation of the Funds' private placement memorandums ("PPMs") for Mr. Carrow's, Mr. Heckler's, and Ms. Smith's personal benefit. (Id. ¶¶ 38, 52, 111(c)).

- As managing partner at Citrin, Mr. Carrow worked "extensively" with Ms. Bedell regarding her taxes and finances, while falsely claiming to have disassociated from the Funds. (Id. ¶¶ 37, 38, 111(g)). Under Mr. Carrow's guidance, Citrin provided Ms. Bedell with its 2012 Audit Report for Cassatt. (Id. ¶ 42). The report represented that

10

- Cassatt had $45,451,676 in AUM, and that its financial statements were prepared in accordance with GAAP. (Id. ¶¶ 42-45). These representations were false and unsupported by any real documentation. (Id. ¶¶ 81-85, 111(c), (d)).

- When significant issues arose with Cassatt and CV Opportunities in Spring or Summer 2017, Mr. Carrow and his co-conspirators concealed those issues from Ms. Bedell. (Id. ¶ 57). Indeed, rather than informing her of the Funds' problems, Mr. Carrow and Mr. Heckler worked together to formulate a plan wherein certain select limited partners—referred to in internal email communications as members of the "Carrow Group"—would be paid before any other limited partners, irrespective of the formal redemption procedures set forth in the Funds' PPMs. (Id. ¶ 57-58). In forming the Carrow Group, Mr. Carrow and Mr. Heckler discussed their plan to pay its members before paying Plaintiffs' redemption. (Id. ¶ 60).

These allegations far exceed what is required by Rule 9(b). Indeed, cases in this district, recognizing that facts supporting a fraud claim are often difficult to particularize prior to discovery because they are peculiarly within the defendant's knowledge, uniformly hold that a fraud plaintiff need not include unassailable proof in her complaint. See In re Am. Travellers Corp. Securities Litig., 806 F. Supp. 547, 554 (E.D. Pa. 1992). Instead, a plaintiff need only plead fraud in sufficient detail "to put the defendants on notice of the precise misconduct with which they are charged." Hayes v. Am. Int'l Grp., No. CIV.A. 09-2874, 2009 WL 4591531, at *4 (E.D. Pa. Nov. 30, 2009). Mr. Carrow cannot seriously contend that he is not on notice of the fraud sufficient to formulate a response based on the above obligations.

To the extent that Mr. Carrow argues that statements attributed to a combination of himself, Mr. Heckler, and Ms. Smith are insufficient to allege fraud, this argument is misplaced. A complaint alleging fraud against multiple defendants need only "present enough facts to link each defendant to the fraud." Thomas v. Siemens AG, 2010 WL 1711775, at *5 (E.D. Pa. Apr. 26, 2010). See also Rosenbaum & Co. v. H.J. Myers & Co., No. 97-824, 1997 WL 689288, at *3 (E.D. Pa. Oct. 9, 1997) (complaint alleging fraud against multiple defendants need only enunciate "the facts on which the plaintiffs base their claims against each defendant"). Plaintiffs

11

have done so here, by clearly and adequately outlining the statements and actions attributed to Mr. Carrow. Indeed, the Amended Complaint goes far beyond the type of vague, amorphous complaints that courts have struck down for improperly lumping together allegations. See, e.g., Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993) ("Rule 9(b) is not satisfied where the complaint vaguely attributes the alleged fraudulent statement to 'defendants.'").[3]

Furthermore, courts in this district have held that a fraud claim is sufficiently pled when a defendant is alleged to have done little more than be present at—and presumably participate in—a meeting where his team made misrepresentations. See, e.g., Fox Fuel, a Div. of Keroscene, Inc. v. Delaware County Schools Joint Purchasing Bd., 858 F. Supp. 945, 953-54 (E.D. Pa. 1994) (allegation that "defendants made representations to plaintiff concerning what would constitute 'acceptable performance security' knowing that plaintiff would rely on these representations" at a meeting successfully pled fraud as to the defendants named to have been at said meeting, "since they put [defendants] on notice that statements they made at specific times about a specific topic are alleged [] to be fraudulent misrepresentations"); Berger v. Safemasters Co., Inc., 1986 WL 15025, at *1-2 (E.D. Pa. 1986) (motion to dismiss denied where affidavit attached to response to motion to dismiss alleged that defendant "was present in Pennsylvania during the

---

[3] The only case Mr. Carrow cites for the proposition that the Amended Complaint improperly "lumps together" the allegations against Mr. Heckler and himself is factually inapposite. In Dolan v. PHL Variable Insurance Co., 2016 WL 6879622, at *2 (M.D. Pa. Nov. 22, 2016), the Plaintiffs were victims of a fraudulent scheme conducted by an independent insurance broker and sought monetary relief from four insurance companies for failure to recognize red flags raised by his conduct. The Court held that while the broker's conduct was criminal, the Complaint failed to "plead with particularity why each and every Defendant is responsible for every action taken by Hyduk regarding every Plaintiff, or exactly what acts or omissions each Defendant allegedly committed in ignoring or failing to discover Hyduk's fraud . . . There is no attempt to set forth facts that would put each Defendant on fair notice of the individual conduct that purportedly gives rise to a claim against it." Id. at *6. In other words, the plaintiffs in Dolan merely alleged that they were defrauded by the actions of one defendant and failed to allege why or how its co-defendants were similarly liable.

12

negotiations which preceded both the employment agreement and the sale [at issue]"); Elbeco Inc. v. Estrella de Plato Corp., 989 F. Supp. 669, 676 (E.D. Pa. 1997 (defendants alleged to have made misrepresentations in numerous meetings). Mr. Carrow is alleged to have done far more than simply attend pitch meetings with Ms. Bedell. He was an integral part of the fraud at issue here, and the Amended Complaint adequately alleges as much.

### C. The Amended Complaint Sufficiently Describes Mr. Carrow's Numerous False Statements

Even if the Court were to determine that only statements, conduct and omissions alleged to be directly attributable to Mr. Carrow can be considered in ruling on this Motion—and it should not—the Amended Complaint still pleads fraud with particularity. Mr. Carrow argues that "Plaintiff makes no distinction between the alleged statements made by Mr. Carrow and those made by Mr. Heckler" and, therefore, he is unaware of the fraud allegations against him. (Mot. 9). To the contrary, the Amended Complaint details Mr. Carrow's fraudulent behavior, including a recounting of his specific misrepresentations, misconduct, and omissions and when they occurred. (See, e.g., Am. Compl. ¶¶ 15-173, 119-127). For example, Plaintiffs allege that:

- Mr. Carrow told Ms. Bedell that he would not have "any direct involvement with any of the Funds" while serving as Citrin's managing partner to induce her to hire Citrin has her personal accountant and tax advisor. (Am. Compl. ¶¶ 35-36). And "Mr. Carrow claimed that his prior involvement as General Partner provided him with unique insight that would allow him to assist Ms. Bedell with her personal finances . . . [and that] since he was no longer 'directly' involved with the Funds as an investor or partner, he could act as a zealous advocate for Ms. Bedell." (Id. ¶ 36). These representations were false. (Id. ¶¶ 36, 111(g)). In fact, Mr. Carrow was intimately involved with the Funds until fall 2017, at a minimum, through promoting the Funds to other Citrin clients in exchange (at least in part) for monetary kickbacks. (Id. ¶¶ 38, 57, 61, 72). He was also listed as Cassatt's General Partner and Managing Member in subscription documents *for years* after his purported disassociation with the Funds. (See id. ¶¶ 38, 71-72).

- Mr. Carrow told Ms. Bedell that "her investments were secure" based on his access to confidential information concerning the Funds' investments and trading strategies to induce her to hold and make additional investments in the Funds through Inner Design, which Mr. Carrow himself created through Citrin in 2014. (Id. ¶¶ 46-50). Plaintiffs'

13

investments were not secure and were instead being used for Mr. Carrow and his co-conspirators' personal investments, to pay members of the Carrow Group, and to pay Citrin. (Id. ¶¶ 57-60, 111(f)). And neither Mr. Carrow nor Citrin had access to confidential information about the Funds because they were nothing more than an elaborate Ponzi scheme. (Id. ¶¶ 110-111).

- As the fraud began to fall apart, and with Ms. Bedell seeking redemption of her investments, Mr. Carrow repeated the lie that he had no involvement with Cassatt, stating that "his name had been stamped on the Cassatt documents without his permission, and that Citrin Cooperman had severed all formal ties with the Funds." (Id. ¶¶ 71-72). As described above, this representation was false and in fact conflicted with documents in Mr. Carrow's possession and was intended only to allow Mr. Carrow to skate responsibility while stringing Ms. Bedell along for as long as possible. (See id.).

- Mr. Carrow talked Ms. Bedell out of liquidating her investments in 2014 by telling her that Cassatt had other trading strategies "in the pipeline" that would improve the Fund's performance following a "below average" month. (Id. ¶ 47).

In short, Plaintiffs are *not* relying on "imprecise allegations" against Mr. Carrow. (Mot. 9). Rather, the Amended Complaint describes in detail Mr. Carrow's role in this fraud and attributes multiple statements and actions directly—and only—to him. Even if forced to stand alone, these statements make clear that Mr. Carrow falsely held himself out as independent from the Funds in order to induce Ms. Bedell's investments, falsely convinced her that her investments were safe and secure with his "independent" oversight, and reiterated to the bitter end that he had no involvement with Plaintiffs' failing investments.

The Amended Complaint more than adequately puts Mr. Carrow on notice of the allegations against him. He, along with his co-conspirators, used a position of trust to entice Ms. Bedell to invest her life savings in several funds that existed for the sole purpose of lining their own pockets. Through lies and manipulation, he convinced Ms. Bedell to maintain and increase her investments, and left her with nothing when the fraud finally fell apart.

**CONCLUSION**

For these reasons, the Court should deny Mr. Carrow's Motion to Dismiss. Alternatively, Plaintiffs request leave to replead and file an Amended Complaint. See Waterfront Renaissance Assocs. v. City of Philadelphia, 701 F. Supp. 2d 633, 639 (E.D. Pa. 2010) ("Leave to amend pleadings is to be freely given[.]").

                                              /s/ Ira Neil Richards
David Smith (Pa. I.D. No. 21480)
Ira Neil Richards (Pa. I.D. No. 50879)
Daniel P. Lawn (Pa. I.D. No. 326114)
SCHNADER HARRISON SEGAL & LEWIS LLP
1600 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 751-2503
Irichards@schnader.com

ATTORNEYS FOR PLAINTIFFS

*Pro hac vice*:
William C. Nystrom
Dana A. Zakarian
Nina S. Hirsch
NYSTROM BECKMAN & PARIS LLP
One Marina Park Drive, 15th Floor
Boston, MA 02210
Telephone: (617) 778-9100
wnystrom@nbparis.com
dzakarian@nbparis.com
nhirsch@nbparis.com

Dated: January 20, 2021