**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **LINDA BEDELL, THE LINDA BEDELL INDIVIDUAL RETIREMENT ACCOUNT, LANDON BEDELL, KEATON BEDELL AND INNER DESIGN PROFIT SHARING PLAN,** | **CIVIL ACTION** |
| **Plaintiffs,** | |
| | **NO.  20-3804** |
| **v.** | |
| **CV SPECIAL OPPORTUNITY FUND, LP,** **Defendant.** | |

## MEMORANDUM OPINION

Plaintiffs—Linda Bedell, her family members Landon and Keaton Bedell, and two retirement plans of which she is the beneficial owner, The Linda Bedell Individual Retirement Account and Inner Design, Inc. Profit Sharing Plan—allege that Defendant CV Special Opportunity Fund, LP ("CVSOP"), along with other entities and individuals who were formerly Defendants in this action,[1] convinced and encouraged Linda Bedell ("Bedell") and her family to invest "more than $35 million" in hedge funds "through a series of bogus investments" over the course of many years as part of a "series of elaborate Ponzi schemes."

Plaintiffs brought claims against Defendant CVSOP under 70 P.S. §§ 1-401 and 1-501 of the Pennsylvania Securities Act.  They are now seeking, pursuant to Federal Rule of Civil Procedure 55(b)(2), a default judgment against CVSOP in the amount of $20,983,287.68. CVSOP, while served, has failed to plead or otherwise defend in this action.

## I.    FACTUAL BACKGROUND

Defendant CVSOP is a Delaware limited partnership with its principal place of business

---

[1] Defendants in this action have, in addition to CVSOP, included George Heckler, Mark Carrow, Cassatt Short Term Trading Fund, LP, Citrin Cooperman & Company, LLP, Topwater Investment Management, LLC, and Green Mountain Fund, LLC.  All Defendants except CVSOP have been terminated.

in West Conshohocken, Pennsylvania.  All of the partners of CVSOP are citizens of

Pennsylvania and South Carolina.  CV Fund Partners, LLC ("CV LLC") was the general partner

of CVSOP at all relevant times, and its members are also citizens of Pennsylvania and South

Carolina.

Before getting to CVSOP's alleged involvement in the events underlying this case, some

background exposition is necessary.

### A.  Conestoga Fund

The story begins in 1998, when Mark Carrow formed a hedge fund known as Conestoga.

Carrow was "responsible for all of Conestoga's administrative functions."  Also involved in

Conestoga, among others, was George Heckler, who was "responsible for all of Conestoga's

investment activities."  Another individual, Brenda Smith, is described by Plaintiffs as the

"purported administrator" of the funds at issue in this litigation, apparently including

Conestoga—although her precise relationship to the fund is unclear.

Around 2002, Bedell was introduced to Heckler by another, unnamed, Conestoga

investor.  At that time, Heckler and Carrow represented, according to Plaintiffs' description, that

"Conestoga was a safe fund that focused on transparency and preservation of capital, and was

generally only available to a group of select investors consisting of friends and family members

of the partners."  Based on such representations, which were "repeated on numerous occasions"

by Heckler, Carrow, and Smith, in 2004 Bedell invested $750,000 in Conestoga.  Bedell's initial

investment began to show returns and her trust and confidence in Heckler, Carrow, and Smith

grew as she "received numerous reports and account statements showing both the fund's

liquidity and steady growth in her investments."

Following her initial investment, between 2004 and 2010, upon the recommendations of

Heckler and Carrow, Bedell made a series of further investments in Conestoga in separate

limited partner accounts.  These investments showed steady, consistent returns, and Bedell, as

time went on, received funds within thirty days of any redemption requests.

### B.  Two New Funds: Cassatt and CVSOP

But in 2010, Conestoga's growth stalled.  While Heckler and Smith assured Bedell that this was just a temporary hurdle caused by liquidations following the 2008 financial crisis, they also told her that they had formed two new hedge funds to combat the slowed growth: Cassatt Short Term Trading Fund, LP and CVSOP.  It was represented to Bedell that CVSOP was designed to "invest in undervalued and discounted assets."  CVSOP's general partner was CV LLC, and Smith was the managing member of CV LLC.  According to Smith, Heckler would lead the traders in both Cassatt and CVSOP as he was "meticulous" and would "ensure that [Bedell] was 'cared for in the future.'"  Smith, on the other hand, would serve as the funds' administrator and broker-dealer.  Finally, Carrow would "oversee" CVSOP's work.

By November 24, 2010, Bedell had transferred her remaining assets in Conestoga to CVSOP, and, for many years, continued to make investments in Cassatt and CVSOP.  Then, in September 2014, she transferred investments in Cassatt to CVSOP.

Year after year, Heckler and Smith provided Bedell with statements demonstrating steady and consistent growth in her investments.  Specifically, Plaintiffs aver that Defendants provided Bedell with "Master Position Summary Sheets" showing growth associated with each of her separate accounts in CVSOP.  In addition to these sheets, Heckler, Smith, and Carrow consistently reassured Bedell that her investments were earning "steady" and "consistent" returns year after year.

### C.  Funds Begin to Break Down

Then, around September 2017, Heckler told Bedell that he would be returning investments to the funds' limited partners, including Bedell, over the course of the following year because he was tired of the investment business.  Plaintiffs allege, however, that the real reason Heckler was winding down the funds was because of "significant issues" with CVSOP

3

that were concealed from the limited partners.

In early 2018, Bedell was expecting liquidation of all her assets in CVSOP as well as the other funds that are not at issue here.  But Heckler started to offer various excuses as to why the monies were not forthcoming, including that some investors had made earlier redemption requests than Bedell.  Heckler told Bedell she could trust him and that she should not worry.

By mid-2018, repayment of Bedell's funds had still not begun.  Bedell also discovered she was the largest investor in the funds.  On these grounds, Bedell submitted formal redemption requests for her accounts and suggested that, at the very least, Heckler return her money in installment payments of $1 million each month.  Heckler made one such payment in June 2018 but thereafter failed to make any such payment.

On July 1, 2018, in response to Bedell's repeated inquiries, Heckler sent an email to Bedell offering to provide her with collateral, involving his personal assets, until her accounts could be liquidated.  Heckler claimed these assets were equal to Bedell's investments in the funds.  Heckler ultimately never provided Bedell with this collateral.

In December 2018, Heckler told Bedell that he was going to hire an attorney to work with the limited partners to ensure the remaining funds would be distributed.  While his attorney began to send out status reports starting in January 2019 on the investments managed by Heckler, Bedell nonetheless continued to face delay in redeeming her investments.  In March 2019, Heckler told Bedell he had not received her formal redemption request, so Bedell sent Heckler and Smith a second copy of her formal request to liquidate all of her accounts.

Bedell still has not received redemptions from her investments in CVSOP.  Heckler and his attorney have also ceased communicating with her about the status of the funds and her distributions.

### D.  Ending Capital Balance

Plaintiffs maintain that the final capital balance for the investments in CVSOP is

reflected in an exhibit attached to their motion (Exhibit M), a spreadsheet entitled "CVSOP

Combined Investment Summary" that purports to show the capital balance of Bedell's CVSOP

investments, including contributions, withdrawals, and gain/loss statements, from 2010 to 2018.

The document reflects that her final capital balance, as of September 30, 2018, was

$24,503,080.82.

### E.  Heckler SEC Consent to Judgment

On March 9, 2021, the SEC issued a civil complaint against Heckler charging him with

four separate violations of securities law.  *SEC v. Heckler*, No. 21-cv-04587 (D.N.J. March 9,

2021).  It alleged, *inter alia*, that:

> Between 2009 and 2019, Heckler defrauded investors and [sic] CV Special Opportunity
> Fund LP [] and Cassatt Short Term Trading Fund LP [], two hedge funds he advised
> and controlled.  He repeatedly misled investors by telling them they were earning
> consistent gains while, in reality, their money had not been invested as promised
> (or at all), and the value of the money that had been invested was decimated by
> poor performing investments.

On March 11, 2021, Heckler filed a Notice of Consent to Judgment consenting to an injunction

permanently enjoining him from violating the securities law at issue and providing for the

disgorgement of ill-gotten gains.  *Id.* (ECF No. 3).

### F.  Heckler Stipulation to Judgment

During the course of this action, Heckler stipulated to an entry of judgment against him in

the amount of $26,155,015.14.  (*See* ECF No. 33).

## II.   DEFAULT JUDGMENT LEGAL FRAMEWORK

Rule 55 draws a distinction between entry of default and default judgment.  Fed. R. Civ.

P. 55.  Rule 55(a) allows the Clerk of Court to enter a default against a defendant for failure to

plead or to otherwise defend.  Here, Plaintiffs requested the Clerk of Court to enter default

against CVSOP in accordance with Rule 55(a), and default was subsequently entered (ECF No.

89).

But entry of default is not sufficient *per se* to secure a default judgment. *Broad. Music, Inc. v. Spring Mount Area Bavarian Resort, Ltd.*, 555 F. Supp.2d 537, 541 (E.D. Pa. 2008) ("The entry of a default by the Clerk, however, does not automatically entitle the non-defaulting party to a default judgment."). If the plaintiff's claim is for a "sum certain or a sum that can be made certain by computation," the Clerk can—and "must"—enter judgment for that amount against the defaulting defendant. Fed. R. Civ. P. 55(b)(1). In all other cases, however, the party seeking default must apply to the court for default judgment. Fed. R. Civ. P. 55(b)(2). If a party does so, and if the court needs to "conduct an accounting," "determine the amount of damages," "establish the truth of any allegation by evidence," or "investigate any other matter" to enter or effectuate such judgment, the court "may conduct hearings" accordingly. Fed. R. Civ. P. 55(b)(2).

As a threshold matter in evaluating whether default judgment should be entered, a court must determine whether the complaint establishes a "legitimate cause of action" against the defendant(s) against whom default judgment is sought. *See Travelers Cas. & Sur. Co. of Am. v. Perlman*, 351 F. Supp.3d 930, 932 (E.D. Pa. 2019); *see also J&J Sports Prods., Inc. v. Ramsey*, 757 F. App'x 93, 95 (3d Cir. 2018); 10A Charles Alan Wright, Arthur R. Miller, *et al.*, Federal Practice & Procedure § 2688.1 (4th ed.) ("Even after default, however, it remains for the court to consider whether the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit conclusions of law.").

Following that threshold inquiry, the Court considers three factors—popularly referred to as the "*Chamberlain* factors"—to determine whether to enter judgment by default: "(1) prejudice to the plaintiff if default is denied, (2) whether the defendant appears to have a litigable defense, and (3) whether defendant's delay is due to culpable conduct." *Chamberlain v. Giampapa*, 210 F.3d 154, 164 (3d Cir. 2000).

Further, when considering a motion for default judgment, a court takes the well-pleaded

factual allegations of the complaint as true, except for those relating to the amount of damages.

*Comdyne I, Inc. v. Corbin*, 908 F.2d 1142, 1149 (3d Cir. 1990) (citation omitted).  Accordingly,

"[w]hen a plaintiff prevails by default, he or she is not automatically entitled to the damages they

originally demanded." *Comdyne I*, 908 F.2d at 1149.  "Rather, defaults are treated as admissions

of the facts alleged, but a plaintiff may still be required to prove that he or she is entitled to the

damages sought." *Id.*  Such proof can be adduced by evidence elicited through a hearing or

through "detailed affidavits from the claimant" such that the court is able to make a "reasonable

calculation" as to the amount of damages to be awarded.  *See Eastern Elec. Corp. of New Jersey*

*v. Shoemaker Construction, Co.*, 652 F.Supp.2d 599, 605 (E.D. Pa. 2009) (citations omitted).

Damages "need not be proved with mathematical certainty, but only with reasonable certainty,

and evidence of damages may consist of probabilities and inferences." *PPG Indus. Inc v.*

*Jiangsu Tie Mao Glass Co. Ltd*, 47 F.4th 156, 161 (3d Cir. 2022) (quoting *Bailets v.*

*Pennsylvania Tpk. Comm'n*, 181 A.3d 324, 336 (Pa. 2018)).

The decision as to whether to enter default judgment is within the sound discretion of the

court.  *Hritz v. Woma Corp.*, 732 F.2d 1178, 1180 (3d Cir. 1984) ("It is well settled in this

Circuit that the entry of a default judgment is left primarily to the discretion of the district

court.").  Such discretion is exercised against a background presumption against default

judgment.  *Zawadski de Bueno v. Bueno Castro*, 822 F.2d 416, 420 (3d Cir. 1987) ("As a general

matter, this court does not favor default judgments and in a close case, doubts should be resolved

in favor of setting aside the default and reaching the merits."); *see also Gross v. Stereo*

*Component Sys., Inc.*, 700 F.2d 120, 122 (3d Cir. 1983).

### A.  Default Judgment Procedural Background

This is Plaintiffs' third attempt to secure a default judgment against CVSOP.  On their

first attempt, Plaintiffs, while they requested the Clerk to enter a default pursuant to Federal Rule

of Civil Procedure 55(a), failed to move for default judgment pursuant to Rule 55(b) (*see* ECF

No. 74).  The Court informed Plaintiffs of this issue at an in-court hearing on December 15, 2022 and instructed Plaintiffs on the proper procedure for moving for default judgment, as outlined *supra*.  Additionally, the Court noted deficiencies in the Amended Complaint with respect to the allegations pertaining to CVSOP, specifically that Count I (for violations of the Pennsylvania Securities Act) did not clearly state it was against CVSOP in addition to Heckler.  In response, Plaintiffs made an oral motion to amend their Amended Complaint, which the Court granted (ECF No. 81), and Plaintiffs filed their Second Amended Complaint (ECF No. 85), which only brings claims against CVSOP.

Plaintiffs again moved for the Clerk to enter default pursuant to Rule 55(a) (ECF No. 88), and default was entered (ECF No. 89).  Plaintiffs then moved for default judgment for a sum certain pursuant to Rule 55(b)(1) (ECF No. 90).  At a subsequent hearing on April 3, 2023, the Court noted that, while Plaintiffs correctly moved first under Rule 55(a) for entry of default and then under Rule 55(b)(1) for default judgment, they failed to adequately provide a sum certain pursuant to Rule 55(b)(1) to allow for entry of default judgment.  The Court further noted apparent inconsistencies in the damages sought as well as concerns regarding whether the alleged facts sufficiently stated a cause of action, drawing Plaintiffs' attention specifically to concerns regarding the materiality of allegedly misleading statements and whether any alleged statements could be attributed to CVSOP.

Following the second hearing, Plaintiffs submitted the instant motion for default judgment against CVSOP pursuant to Rule 55(b)(2) (ECF No. 97).  Subsequently, a third hearing was held on June 20, 2023, during which the Court again noted concerns with apparent inconsistencies in the damages sought as well as the adequacy of allegations to support the elements of Plaintiffs' cause of action.

### III.   ANALYSIS

#### A.  Personal Jurisdiction

As a preliminary issue, before entering a default judgment, a court must determine

whether it has subject matter jurisdiction and personal jurisdiction over the absent defendant.

*See e.g., Mark IV Transportation & Logistics v. Lightning Logistics, Inc.*, 705 F. App'x 103, 108

(3d Cir. 2017); *see also Allaham v. Naddaf*, 635 Fed. App'x 32, 36 (3d Cir. 2015) ("If a court

lacks personal jurisdiction over a defendant, the court does not have jurisdiction to render a

default judgment, and any such judgment will be deemed void.").  The plaintiff bears the burden

of demonstrating that the court has personal jurisdiction over the absent defendant.  *Allaham*, 635

F. App'x at 37; *D'Onofrio v. Il Mattino*, 430 F. Supp.2d 431, 437 (E.D. Pa. 2006).  In the posture

of a default judgment, a plaintiff may satisfy this burden with a "*prima facie* showing" of

personal jurisdiction and may rest their argument on their pleadings and supporting affidavits.

*D'Onofrio*, 430 F. Supp.2d at 438 (citation omitted).

Here, there is subject matter jurisdiction through diversity of the parties under 28 U.S.C.

§ 1332(a).  The parties are diverse: Plaintiffs are Colorado residents and CVSOP's limited

partnership are citizens of Pennsylvania and South Carolina.  *HB Gen. Corp. v. Manchester*

*Partners, L.P.*, 95 F.3d 1185, 1190 (3d Cir. 1996) ("[F]or diversity jurisdiction purposes, a

limited partnership is considered a citizen of each state in which its partners are citizens.") (citing

*Carden v. Arkoma Assocs.*, 494 U.S. 185 (1990)).  And the amount in controversy alleged

exceeds $75,000 (the *ad damnum* clause of Plaintiffs' Complaint seeks over $35 million).

Plaintiffs, however, have not directly addressed in their Complaint or briefing whether

this Court can exercise personal jurisdiction over CVSOP.  Federal Rule of Civil Procedure 4(k)

authorizes a federal district court to assert personal jurisdiction over a non-resident defendant to

the extent permitted by the law of the state where the court sits.  Fed. R. Civ. P. 4(k)(1)(A);

*O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 316 (3d Cir. 2007).  The Pennsylvania long-

arm statute provides for jurisdiction "to the fullest extent allowed under the Constitution of the United States and may be based on the most minimum contact with this Commonwealth allowed under the Constitution of the United States." 42 Pa. C.S. § 5322(b).  There are two ways to establish personal jurisdiction: general and specific personal jurisdiction.  *O'Connor*, 496 F.3d at 317 (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414-15 & n.9 (1984)).  "A court may exercise general jurisdiction over a defendant where he or she has 'continuous and systematic' contacts with the forum, whether or not those contacts are related to the plaintiff's cause of action."  *Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324, 334 (3d Cir. 2009) (quoting *Helicopteros*, 466 U.S. at 416).  Specific jurisdiction exists if the defendant has "'purposefully directed' his activities at residents of the forum and the litigation results from alleged injuries that 'arise out of or relate to' those activities."  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) (internal citations omitted).

Here, Plaintiffs do not make any argument as to either basis for personal jurisdiction. Without a *prima facie* showing of personal jurisdiction, this Court cannot enter default judgment against CVSOP.

### B.  Legitimate Cause of Action

While the lack of a showing of personal jurisdiction is sufficient *per se* to deny Plaintiffs' request for default judgment, to inform any further request for default judgment, the Court nonetheless turns to whether the Plaintiffs have alleged sufficient facts to support their cause of action.  As explained *infra*, the Court continues to have doubts.

Section 1-501 of the Pennsylvania Securities Act supplies a cause of action and imposes civil liability for violations of Section 1-401.  70 P.S. § 1-501 ("Any person who . . . offers or sells a security in violation of section[] 401 . . . shall be liable to the person purchasing the security from him, who may sue either at law or in equity to recover the consideration paid for the security, together with interest at the legal rate from the date of payment, less the amount of

any income or distributions, in cash or in kind, received on the security, upon the tender of the security, or for damages if he no longer owns the security."); *see Fox Int'l Rels. v. Fiserv Sec., Inc.*, 490 F. Supp.2d 590, 603 (E.D. Pa. 2007), *order corrected* (May 7, 2007) (citation omitted); *Biggans v. Bache Halsey Stuart Shields, Inc.*, 638 F.2d 605, 609 (3d Cir. 1980), *overruled in part on other grounds by In re Data Access Sys. Sec. Litig.*, 843 F.2d 1537 (3d Cir. 1988).

Section 1-401 makes it "unlawful for any person, in connection with the offer, sale or purchase of any security in [Pennsylvania], directly or indirectly" to "employ any device, scheme or artifice to defraud"; "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading"; or "engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person."  70 P.S. § 1-401.

Section 1-401 was "enacted to address substantially the same wrongful conduct as Rule 10b-5," its federal counterpart promulgated under the Securities Exchange Act of 1934.  *Fulton Bank, N.A. v. UBS Sec., LLC*, 2011 WL 5386376, at *7 (E.D. Pa. Nov. 7, 2011); *Leder v. Shinfeld*, 609 F. Supp.2d 386, 395 (E.D. Pa. 2009).  While there is an "absence of guiding precedent from Pennsylvania courts" on what elements Section 1-401 requires, "it has long been the practice" in the Third Circuit "to treat section 1-401 claims as requiring the same elements of proof as required under Rule 10b-5."  *Leder*, 609 F. Supp.2d at 395 (E.D. Pa. 2009) (listing cases); *see also Fulton Bank, N.A.*, 2011 WL 5386376, at *7 ("Given . . . the absence of determinative case law as to what is required to make out a cause of action under the [Pennsylvania Securities Act], the federal courts and the Pennsylvania trial courts that have considered the issue have uniformly treated [Pennsylvania Securities Act] claims as requiring the same elements of proof as required under Rule 10b-5 and have therefore analyzed them in identical fashion.") (listing cases).

Accordingly, the elements of this cause of action are: "(1) that the defendant made

misstatements or omissions of material fact; (2) with scienter; (3) in connection with a purchase

or sale of securities; (4) upon which the plaintiff relied; and (5) the plaintiff's reliance was the

cause of its injury." *Fulton Bank, N.A.*, 2011 WL 5386376, at *8.  Plaintiffs must also satisfy the

heightened pleading requirements under Federal Rule of Civil Procedure 9(b).  *Id.*

"[I]nformation becomes 'material' when there is 'a substantial likelihood that the

disclosure of the omitted fact would have been viewed by the reasonable investor as having

significantly altered the total mix of information made available.'"  *Id.* (quoting *TSC Indus., Inc.*

*v. Northway, Inc.*, 426 U.S. 438, 449 (1976)) (internal quotation marks omitted).  A plaintiff's

reliance on the false representation must be reasonable, and the resulting injury must be the

proximate cause of that reliance.  *Id.* at *11.

### 1. *Plaintiffs' Argument*

Although, as described above, this is the third time that Plaintiffs have sought default

judgment against CVSOP and this Court has repeatedly raised concerns at prior hearings as to

whether Plaintiffs have sufficiently alleged facts to support their cause of action under Sections

1-401 and 1-501 of the Pennsylvania Securities Act, Plaintiffs have submitted only a 5-page

argument that fails to allay these concerns.

Plaintiffs broadly assert that the facts recited in the Second Amended Complaint support

each of the elements for a Section 1-401 violation, arguing that "[t]hrough its principals, Mr.

Heckler and Ms. Smith, CVSOP knowingly and falsely represented itself as a safe investment

vehicle with a diversified investment strategy that would be managed so as to ensure that Ms.

Bedell would be 'cared for in the future.'"  In support, Plaintiffs cite to a *single* paragraph in the

operative Complaint, which states as follows:

> According to Ms. Smith, Mr. Heckler would lead the traders in both Cassatt and
> CVSOP as he was "meticulous" and would ensure that Ms. Bedell was "cared for
> in the future," Ms. Smith would continue to serve as the funds' administrator and
> broker-dealer, and Mr. Carrow would "oversee" CVSOP work.

Plaintiffs offer no argument as to how any such statement by Smith—or Heckler—rises to the level of materiality required for their claims against CVSOP.  Nor do they offer any argument as to how Plaintiffs' reliance on any such statement was reasonable or was the proximate cause of their injury.  Instead, Plaintiffs baldly assert in their brief—without citation to any supporting allegations in their Complaint—that "Bedell relied on these knowingly false representations . . . when she first transferred all of her assets into CVSOP . . . and when she continued to invest additional funds through 2017."  Rather than offer a clear argument—with citations to their Complaint—as to how their allegations support the elements for a Section 1-401 violation, Plaintiffs appear to suggest that the Court should rely on their say-so alone.  This is plainly not sufficient.

Moreover, to the extent Plaintiffs appear to rely on any allegedly misleading statement(s) by Heckler, they fail to demonstrate that any such statements are attributable to CVSOP.  While Plaintiffs assert that Heckler's actions are attributable to CVSOP because he was a "principal" of CVSOP, they point to no legal authority supporting this assertion.  While they cite to a case examining the actions of a "principal" of a corporation in the context of a Pennsylvania Securities Act claim, *see Wen v. Willis*, 117 F. Supp.3d 673, 690-91 (E.D. Pa. 2015), Plaintiffs point to no authority addressing what constitutes a "principal" with respect to a limited partnership like CVSOP and under what circumstances a "principal's" actions can be attributed to a limited partnership.

It is not the Court's responsibility to construct arguments for the parties.  *See Joe Hand Promotions, Inc. v. Yakubets*, 3 F. Supp.3d 261, 271 (E.D. Pa. 2014).  Default judgment is not warranted in light of Plaintiffs' failure to demonstrate their Complaint supports a legitimate cause of action.

### C.  Damages

Additionally, Plaintiffs have failed to address this Court's previously stated concerns

regarding the damages they seek.

Plaintiffs seek $16,377,068.82 plus prejudgment interest, totaling, by their calculation, $20,983,287.68.  To reach the $16 million figure, Plaintiffs assert that, of the $24,503,080.82 ending capital balance reflected on the CVSOP Combined Investment Summary attached to their motion and referenced in Bedell's declaration, they have only recovered $8,126,012.  Further, Plaintiffs argue that CVSOP can be held jointly and severally liable for such damages even though they are already reflected in the stipulated judgment entered against Heckler (within the greater amount of $26,155,015.14).

As an initial matter, the Plaintiffs, through their three attempts at seeking default judgment, have been all over the shop with respect to how much they seek from CVSOP.  Their first request sought $26,155,015.14[2]; the second sought either $25,155,015.14 or $26,155,015.14[3]; and the third now seeks $20,983,287.68.  Nowhere do they explain the reason for these changes.

Plaintiffs latest number—$20,983,287.68—relies on subtracting the amount Plaintiffs have purportedly recovered ($8,126,012) from the $24,503,080.82 ending capital balance reflected in the CVSOP Combined Investment Summary.  Plaintiffs do not explain where this document comes from (Bedell's declaration only states that she "made" the chart), or attempt to demonstrate how it is consistent with other allegations in their Complaint or other documents attached to the motion for default judgment.  Nor do Plaintiffs explain how these sought-after amounts accord with the $35 million featured in the *ad damnum* clause of their Second Amended

---

[2] For this first request, Plaintiffs simply relied on the amount of the stipulated judgment against Heckler.  *See* ECF No. 74-1.

[3] There is internal inconsistency in the second request, wherein Plaintiffs stated a sum certain of $25,155,015.14 but also, in an attached affidavit, stated they were entitled to $26,155,015.14.  *See* ECF Nos. 90 & 90-1.  It is possible this $1 million inconsistency reflects the single $1 million payment Heckler made to Plaintiffs before this litigation commenced, but without more .

Complaint.  Making sense of Plaintiffs' damages claim should not require searching for needles in the proverbial haystack—especially here where Plaintiffs have been given multiple opportunities, including at the most recent in-court hearing, to present evidence justifying the millions of dollars to which they assert they are entitled.

Apart from these issues with documentation, Plaintiffs have also made no argument whatsoever that, as a legal matter, the damages they seek are consistent with and calculated according to Section 1-501 of the Pennsylvania Securities Act, which provides that the purchaser

> may sue either at law or in equity to recover the consideration paid for the security, together with interest at the legal rate from the date of payment, less the amount of any income or distributions, in cash or in kind, received on the security, upon the tender of the security, or for damages if he no longer owns the security.  Damages are the amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it, plus interest at the legal rate from the date of disposition.

70 P.S. § 1-501(a).

Similarly, Plaintiffs fail to support that CVSOP can be jointly and severally liable for damages already reflected in the stipulated judgment against Heckler.  At the most recent default judgment hearing, Plaintiffs argued that they can seek from CVSOP damages that are already reflected in the stipulated judgment against Heckler because CVSOP can be jointly and severally liable for such damages.  In support of this argument in their default judgment briefing, Plaintiffs merely cite and quote Section 1-503 of the Pennsylvania Securities Act.  70 P.S. § 1-503.  While that section does provide for joint and several liability under certain circumstances, *see* 70 P.S. § 1-503(a) (describing the class of persons subject to joint and several liability for "materially aid[ing] in the act or transaction constituting [a] violation" of Section 1-501), Plaintiffs advance no argument, either based on relevant case law or the language of the statute, that those circumstances

obtain here with respect to CVSOP.[4]

Additionally, while Plaintiffs seek prejudgment interest they point to no applicable authority that warrants the receipt of such interest[5] and provide no accounting for how they have calculated the prejudgment interest the seek.

In light of the above, the Court harbors significant doubts as to Plaintiffs' claim for damages.

## IV.    CONCLUSION

Because Plaintiffs have not adequately demonstrated that: (1) this Court can exercise personal jurisdiction over CVSOP; (2) they have a legitimate cause of action; or (3) that they are entitled to the damages they seek, their request for default judgment shall be denied.

An appropriate order follows:

**BY THE COURT:**

**/s/Wendy Beetlestone, J.**

_____
**WENDY BEETLESTONE, J.**

---

[4] Instead, Plaintiffs cite *SEC v. Chapman*, 2021 WL 199539, at *4 (E.D. Pa. Jan. 20, 2021), in support of their assertion that Section 1-503 has been "applied to find joint and several liability among investment funds and their principals who have committed tortious actions under the PSA."  But *Chapman* deals with neither Section 1-503 nor the Pennsylvania Securities Act.

[5] Instead, Plaintiffs again rely on *Chapman*, 2021 WL 199539, at *9, which does not involve the Pennsylvania Securities Act.